**KANSAS CITY, Missouri, a Municipal Corporation, Respondent,**

**v.**

**BERKSHIRE LUMBER COMPANY, a Corporation, Appellant.**

**No. 50996.**

Supreme Court of Missouri,

Division No. 1.

July 12, 1965.

Motion for Rehearing or for Transfer to Court En Banc Denied Sept. 13, 1965.

Herbert C. Hoffman, City Counselor, Ned B. Bahr, Asst. City Counselor, for respondent.

Henry G. Eager, Kansas City, Swanson, Midgley, Jones, Blackmar & Eager, Kansas City, of counsel, for appellant.

WELBORN, Commissioner.

This is a condemnation proceeding by the City of Kansas City under Article VI of its charter in connection with the construction of a viaduct in Truman Road. Berkshire Lumber Company filed its claim for $60,000 damages. In a trial before a six-man freeholders' jury, Berkshire's witnesses placed its damages at between $34,000 and $55,000. Berkshire asked the freeholders' jury for "at least $40,000" but the award was for

$11,300. Because of the amount in dispute, we have jurisdiction of this appeal by Berkshire.

On October 6, 1961, Kansas City enacted enabling Ordinance No. 26634, authorizing the construction of a reinforced concrete and steel viaduct in Truman Road, 2,809.75 feet in length, crossing three railroad line tracks and the Big Blue River. The viaduct was to be 61.25 feet in width, containing two roadways each 26 feet wide separated by a medial strip four feet in width. The ordinance provided for the condemnation of private property required for the project. It also provided for the condemnation of easements to support embankments or fill when necessary to bring the highway to the required grade.

Section 8 of the ordinance read as follows:

"Just compensation for the private property herein condemned, easements taken and damages accruing by reason of said improvement due to the partial obstruction of existing Truman Road, interference with light and air, and deprivation of access by reason of said improvement shall be assessed and paid according to law, payment of said compensation and damages to be made by Kansas City in cash out of the Kansas City Trafficway and Boulevard Bond Fund, 2d Issue, or other funds available or to be made available for said purpose. Proceedings for the taking and damaging of said property and the assessment of other damages accruing pursuant to law shall be prosecuted in the Circuit Court of Jackson County, Missouri, at Kansas City, as one public improvement, pursuant to the provisions of Article VI of the Charter of Kansas City, Missouri, the power conferred by said Article VI being hereby invoked. Insofar as owners of private property may be entitled to damages by reason of any change of grade of any highway, by denial of access to any public highway or by reason of the construction of said viaduct upon Truman Road, such damages shall be ascertained in the same proceedings in the manner pro-

vided in Article VII of the Charter of Kansas City, so far as applicable. * * *"

Berkshire was the owner of a tract of 106,593 square feet fronting on the north side of Truman Road for 371 feet and averaging 284.57 feet in depth. The west end of the viaduct was 528 feet west of Berkshire's west property line. Required to be taken for the project from Berkshire and the subject of this litigation was a tract of 4,008 square feet. The tract taken fronted on the north side of Truman Road for 220.88 feet and varied in depth from 10.43 to 19 feet. An additional 2,500 square ft. easement for embankment fill was also taken from Berkshire. The easement area lay immediately to the north of the 4,008 square ft. tract taken from Berkshire.

Berkshire had acquired the almost 2½-acre tract in 1910. Berkshire operated a "cash and carry" lumber business at the location until 1943, when the tract was leased to Jones Lumber Company for a similar operation. Jones' annual rental was $7,800, having been increased from $4,800 in 1954. There were four buildings on the property, all designed for use in connection with a lumber business operation. The main building, a brick and frame part one- and two-story structure was in the vicinity of the southeast corner of the Berkshire tract and fronted 150 feet on Truman Road. This building, with signs "Jones Lumber Company" prominently displayed thereon, was, prior to the construction of the viaduct, visible to approaching Truman Road traffic for about three blocks in both directions.

As planned and constructed, the roadway of the viaduct is from 12 to 32 feet above and south of the Berkshire tract. As a part of the project, ramps were constructed on either side of both the east and west approaches to the viaduct. These ramps, constructed at approximately the same grade as old Truman Road, permit vehicles to travel beneath the viaduct on the old roadway which was widened approximately 9 feet along the east portion of the Berkshire tract. The northwest ramp, 22 feet in width, ad-

joins the Berkshire tract on its south border for some 220 feet. The viaduct structure rests on T-shaped concrete piers placed at varying distances along the center of the old roadway. Five such piers, 9 feet wide and 3½ feet thick, are now located in the old roadway in front of the Berkshire tract. A traffic control island was also constructed in the center of the roadway between the second and fourth pier in front of the Berkshire tract. The island, some 150 feet in length, is 56 feet wide at its west end and approximately 20 feet wide at its east end. The island is in front of one of the three truck entrances to the main building on the tract and makes the westbound traffic lane at that point approximately 22 feet in width.

On the issue of damages, the condemnee's expert witnesses testified to damages to Berkshire of a minimum of $34,000 and a maximum of $55,000. Condemnee's witnesses emphasized the reduction in value, resulting from the presence of the viaduct, of the property remaining after the taking. One of the condemnee's witnesses expressed the opinion that the value of the strip taken was approximately $4,850. However, his estimate of total damage amounted to $48,-000, based upon before and after valuation of the entire tract of $147,000 and $99,000. This witness estimated a "utility loss" of $22,050. According to him, this item was made up of a number of factors, including change in visibility of the property resulting from the construction of the viaduct approach and access. According to the witness, the change in the traffic would result in a loss of 90% of the transient business because of poor visibility and accessibility and reduced grade. Other factors considered were availability, advertising value, traffic trend and restriction of light, sight and air. He also estimated a rental loss of $20,905. This was based upon his estimate of a 28.4% decrease in sales on the loss of "cash and carry" business that would justify rental reduction which capitalized at 10% would amount to approximately $20,000. There was an additional rental

loss of $1,500 from advertising signs. Another witness estimated the before-taking value at $149,000 and the after-taking value at $103,760. He placed the value of the land taken at $5,010 and found a 27% loss of value to the remaining property from various factors, including loss of view— " * * * traffic on the viaduct will not see this building"—loss of advertising value and loss of light and air. Another witness estimated damages at $55,000 based on $5,000 valuation for the land taken and $50,000 loss of rental value.

The city's witnesses placed the damages at $2,750 and $3,000. The witness stating the former figure gave the property a before-taking value of $87,750 and an after-taking value of $85,000. The city's witnesses allowed nothing for change of access or loss of traffic flow. Both testified that they took into consideration the loss of light, sight and air, but found no damage from such factors.

The trial court, at the city's request, gave three damage withdrawal instructions which are here under attack. By Instruction No. 4, no award was to be made "for loss of access or deprivation for loss of access to the viaduct structure." By Instruction No. 6, the jury was instructed not to take into consideration "any evidence of alleged damages by any owner or claimant herein which may result in a loss of view or visibility of their respective private property from members of the traveling public passing along, on and adjacent to said respective properties on the roadway of the viaduct improvement." Instruction No. 7 told the jury that it should not make an award or take into consideration "any evidence of alleged damages which may result by reason of a change in the volume of traffic traveling along the existing grade of Truman Road." Instruction No. 9 was given, reading as follows: "The Court instructs you that in arriving at the difference between the fair market value of the remaining property of condemnees immediately after the taking and the fair market value of the whole property immediately before the taking, you may consider any evidence of damages that will result from deprivation of access to Truman Road by reason of said improvement."

According to the appellant, the issue presented is whether or not damages may "be awarded in condemnation proceedings for a material decrease of direct access to and public view of an abutting retail business property caused by the condemnor's erection of an elevated viaduct."

In our opinion, the answer to the question presented in this case is determined by the principles recently applied by the Court En Banc in State ex rel. State Highway Commission v. Meier, Mo., 388 S.W.2d 855, and State ex rel. State Highway Commission v. Brockfeld, Mo., 388 S.W.2d 862. The latter case reversed the decision (which the appellant here relied upon) of the St. Louis Court of Appeals, 378 S.W.2d 254, in the same case.

In Meier, the court stated (388 S.W.2d l. c. 857):

"An abutting owner's property right to 'access' is better described as the right of ingress and egress to and from his property and the abutting public highway. The right also includes the further right to connect with or reach the system of public highways, which right is also subject to reasonable restrictions under the police power of the State in protecting the public and facilitating traffic. The right does not include the right to travel in any particular direction from one's property or upon any particular part of the public highway right-of-way because, after one is upon the highway he has the same right as all other travelers and the right of travel is a public right and controlled by the police power of the State. Nor does the right of ingress or egress to or from one's property include any right in and to the existing public traffic on the highway, or any right to have such traffic pass by one's abutting property. The reason is that all traffic on public highways is controlled by the police power of the State, and what the police power may give an

abutting property owner in the way of traffic on the highway it may take away, and by any such diversion of traffic the State and any of its agencies are not liable for any decrease of property values by reason of such diversion of traffic, because such damages are 'damnum absque injuria', or damage without legal injury.

\*     \*     \*     \*     \*     \*

"Respondent, as an abutting property owner on a public highway, does not now have and has never had any other property interest in the public highway other than a reasonable right of ingress and egress, as stated. Respondent has never had a property right in the traffic, great or small, on the highway, nor a right to recover damages for a decrease in value of her premises by reason of the diversion of traffic away from her property, nor has she had a property right to have the same amount of traffic pass her property as before or to have it move in the same direction. Respondent's property right of access has never extended further than the right to enter upon the highway or to leave it and have reasonable connection to the public road system."

This answers appellant's claim based upon "material decrease of direct access." Appellant retains its previously existing right of access to previously established Truman Road and in turn to the city's streets and highway system. The legal status of such right has in no way been altered by the erection of the viaduct. Admittedly appellant does not have direct access from its property to the viaduct roadway. However, the viaduct roadway does not actually abut appellant's property and appellant never did have any right of direct access to such roadway. The fact that such access was not accorded does not deprive appellant of any right of access.

■ The fact that access to the appellant's property is somewhat more difficult by reason of the construction of traffic islands in front of the property affords no basis for claim for damages to the appellant's property. Filger v. State Highway Commission, Mo.App., 355 S.W.2d 425.

■ Appellant contends that as part of its rights attendant to the ownership of the tract adjoining the highway it had an easement for public view of its property from the highway. Appellant cites no Missouri cases holding that the loss of any such claimed right is an element of damage to be considered upon condemnation. Any claim on this basis is inextricably related to a property right in the traffic upon Truman Road. Cases of this state have consistently refused to accord to property owners any right in the continuation of traffic upon an established highway. As stated in Meier, supra, "Respondent has never had a property right in the traffic, great or small, on the highway, nor a right to recover damages for a decrease in value of her premises by reason of the diversion of traffic away from her property, nor has she had a property right to have the same amount of traffic pass her property as before or to have it move in the same direction." See also State ex rel. State Highway Commission v. Ballwin Plaza Corporation, Mo.Sup., 382 S.W.2d 633, 637.

The court of appeals, in its opinion in Brockfeld, supra, cited with approval and relied upon People v. Ricciardi, 23 Cal.2d 390, 144 P.2d 799. In that case, the court held that the owner of property adjacent to a highway on which an underpass was constructed was entitled to have taken into consideration in determining his damages a loss of easement of public view. As above mentioned, the court en banc rejected the court of appeals' opinion in Brockfeld and inferentially the philosophy of the cases therein relied upon. Ricciardi would seem to have rejected the idea that any dimunition in the value of land adjacent to a public improvement resulting from the diversion of traffic past the premises is noncompensable. See Comments, 18 So.Cal. Review 42, 44. See also A. E. Nettleton Company v. State, 11 A.D.2d 899, 202 N.Y. S.2d 102, 104.

We find this case controlled by the principles of Meier and Brockfeld, supra. Therefore, we will not undertake to distinguish or comment upon the many cases, a large number of which are from other jurisdictions, relied upon by appellant. We do note that many of the cases cited by appellant, such as Rourke v. Holmes Street Railway Company, 221 Mo. 46, 119 S.W. 1094 (the first case cited by appellant in support of its point made and, therefore, according to our rules, one of the three principal authorities relied upon by the appellant, Civil Rule 83.05(c), V.A.M. R.), involved the construction of a viaduct by privately owned railroad or street railway corporations. Although appellant states that the distinction between those cases and this, on the grounds of the authority erecting the viaduct, is a distinction without a difference, it is, nevertheless, a distinction which has long been recognized. The basis for this distinction is that a private corporation's erection of a viaduct over a public street, as pointed out by the quotation from Rourke (Mo. App., 177 S.W. 1102 l. c. 1105) set forth in appellant's brief, imposes an "unusual and additional servitude" upon an "open public street." Insofar as a governmental agency which constructs and maintains streets is concerned, it has the right to employ its interest in the right-of-way for highway purposes in any proper manner consistent with such purpose. "What makes street frontage valuable is the fact that people travel over the street, and the abutter cannot complain of improvements that facilitate such travel. He must anticipate that such improvements will be made, and that changes in the mode of travel will occur." Kratovil-Harrison, Eminent Domain—Policy and Concept, 42 Cal. Law Review 596, 644. See Hill-Behan Lumber Co. v. State Highway Commission, 347 Mo. 671, 148 S.W.2d 499; Sauer v. City of New York, 206 U.S. 536, 27 S.Ct. 686, 51 L.Ed. 1176.

We are of the opinion that, by the ordinance, properly construed, the city assumed to pay only such damages as the owners of property were by law entitled to receive. We do not find that the ordinance purported to assume an additional liability on behalf of the city. Reference in Section 8 of the ordinance to "deprivation of access" and "damages * * * by denial of access to any public highway" may be explained by the fact that, as to one tract required for the project, right of access thereto from adjacent property was expressly taken. Such fact would likewise account for the giving of Instruction No. 9. Although appellant here complains that such instruction conflicts with Instruction No. 4, no such assignment of error appears in appellant's motion for new trial. Therefore, we do not consider the matter, raised for the first time on appeal. Miller v. Gulf, Mobile & Ohio R. Co., Mo. Sup., 386 S.W. 2d 97, 101–102(7). In any event, since we have concluded that appellant was not entitled to recover for loss of access, we fail to see how the giving of Instruction No. 9 could have done other than benefit appellant.

Appellant contends that the trial court erroneously permitted the city to introduce collateral evidence concerning properties located under other viaducts. Two expert appraisers testified on behalf of the city. Each testified that he found no damage to the appellant from the loss of an easement for light, sight and air. In explaining their conclusions in this regard, in response to questions by counsel for the city, the witnesses testified that they had examined comparable situations involving the operation of lumber yards under three viaducts and that, based upon their knowledge regarding those operations, they concluded that there would be no damage to the appellant on the basis of the loss of light, sight and air easements. There was also testimony regarding operations of other businesses, apparently not lumber businesses, under the Broadway viaduct. Appellant objected to this evidence on the grounds that it related to wholly collateral issues. Although the city offered the testimony,

along with five photographs depicting the lumber businesses referred to, on all issues, the court received the evidence "purely as explanatory of the witness' explanation of loss because of light, sight and air."

■ In our opinion, there was no error in the trial court's ruling. The witnesses, qualified as experts, were explaining the basis for their conclusion that there was no damage based on the loss of light, sight and air. They did not attempt to testify concerning the comparative values of the properties in other locations. They merely sought to show that continued operation of the lumber business would be practical despite the construction of the viaduct. In this respect the evidence differs from that which the court held should have been excluded in State ex rel. State Highway Commission v. Vorhof-Duenke Company, Mo. Sup., 366 S.W.2d 329, 340. There, in an effort to show special benefits, a witness on behalf of the state testified concerning an expenditure which was required to be made at another shopping center to provide ramps and access roads. The inference was that in Vorhof-Duenke the defendant would not be required to make such an expenditure and therefore should be assessed benefits based upon the access facilities which would be provided. Similarly, in Union Electric Light & Power Co. v. Snyder Estate Co., 8 Cir., 65 F.2d 297, 310-311, the condemnor sought to show that market values had increased at a lake construction project. In Rourke v. Holmes Street Railway Company, 221 Mo. 46, 119 S.W. 1094, plaintiff's witness sought to mitigate the damages to the defendant by testifying to an increase in rentals from other properties in the area along which a street railway line had been constructed. In the cases relied upon by appellant, the comparisons were offered as substantive proof of the value of or benefit to the property taken. Here, the evidence was offered only in support of the experts' opinion that there was no damage for loss of the particular easement under consideration. There was no error in the admission of the evidence for such purpose. United States v. Johnson, 9 Cir., 285 F.2d 35, 41 (6, 7).

■ In addition, the jury which heard this matter was a six-man freeholders' jury. This procedure is authorized by the city's charter. Article VI, Secs. 149–152. Such a jury in assessing the damages is not limited to the evidence actually presented to it as is a common law jury. The freeholders' jury is authorized, and perhaps required, personally to view the property taken and may arrive at its verdict entirely independent of the testimony which might be offered. Thomson v. Kansas City, Mo. Sup., 384 S.W.2d 518, 523(2, 3); Kansas City v. Jones Store Co., 325 Mo. 226, 28 S.W.2d 1008, 1016. Here the jury awarded the appellant a sum in excess of the value which any of the witnesses attributed to the land actually taken. Inasmuch as the court's instructions excluded elements of value other than the easement for light, sight and air and the property actually taken, it is reasonable to assume that the jury did not, in any event, accept the opinion of the city's witnesses that there was no damage for the loss of the light, sight and air easement.

Appellant contends that it should have been allowed interest from November 1, 1962, the valuation date. Just how the valuation date was arrived at is not clear. However, the trial court did state: "The valuation date would be November 1, 1962." The ordinance had been enacted on October 6, 1961. The ordinance was filed in the circuit court and publication commenced on May 18, 1962. On July 25, 1962, the appellant executed a consent to begin improvement by which it was agreed that the city might enter the property being taken for the purpose of constructing the viaduct, pending the actual transfer of title. The consent states: "This Consent is given in consideration of the agreement of said city to cooperate in obtaining an early adjudication of the compensation for the taking of said property and for the damages of the

undersigned caused by construction of said viaduct and in consideration of the fact that time is of the essence in proceeding with said improvement in order that said work may be undertaken during the present construction season." Construction began around September 20, 1962. The trial on the appellant's claim was held on November 26 and 27, 1963. The jury was instructed on April 17, 1964 and returned its verdict on April 23, 1964. Appellant offered an instruction under which it would have received interest at the rate of 6% per annum from the city's commencement of construction of the viaduct. The trial court refused the instruction and the appellant now contends that such action was error. The trial court did allow interest from the date of the final judgment, July 24, 1964, until payment of the amount of the jury's award into court on August 24, 1964.

The city takes the position that, under its charter (Art. VI, Secs. 156 and 169), interest was payable only from the date of the judgment until the payment of money into the court.

 We need not here decide whether or not the city's liability for interest would be determined solely according to the provisions of its charter. We do note that it has been held that interest for delay in payment is a right of the owner of property subject to eminent domain and is not dependent upon statutory provisions. St. Louis Housing Authority v. Magafas, Mo.Sup., 324 S.W.2d 697, 699. However, in any event, we are of the opinion that the right to interest does not accrue until the property is actually taken from the owner contrary to his will or agreement. Arkansas-Missouri Power Co. v. Hamlin, Mo.App., 288 S.W.2d 14, 16(1). Here the appellant voluntarily consented to the city's entry upon the land prior to any adjudication in the condemnation proceedings. Having voluntarily surrendered possession of its property to the city without reservation of any claim for interest from the

date of such surrender, we are of the opinion that appellant was not entitled to interest from such date and that the trial court properly rejected its offered instruction.

The judgment is affirmed.

HOUSER and HIGGINS, CC., concur.

PER CURIAM.

The foregoing opinion by WELBORN, C., is adopted as the opinion of the Court.

All of the Judges concur.