774 So.2d 9 (2000)
STATE of Florida, DEPARTMENT OF TRANSPORTATION, Appellant,
v.
SUIT CITY OF AVENTURA, et al., Appellees.
No. 3D00-88.
District Court of Appeal of Florida, Third District.
July 19, 2000.
Rehearing Denied January 3, 2001.
*10 Gregory G. Costas and Pamela S. Leslie (Tallahassee), for appellant.
Savlov & Anderson (Tallahassee); Ruden, McClosky, Smith, Schuster & Russell and Dale Alan Bruschi (Ft.Lauderdale); Earle & Patchen and Brian Patchen, Miami; Lauri Waldman Ross, Miami; Pertnoy, Solowsky, Allen & Haber and Richard Allen, Miami, for appellees.
Before GERSTEN, GREEN, and FLETCHER, JJ.
FLETCHER, Judge.
The State of Florida, Department of Transportation [DOT] appeals an order directing inverse condemnation of certain rights, ostensibly appropriated by the DOT, which are claimed to be appurtenant to a shopping center adjacent to the busy intersection of Ives Dairy Road and Biscayne Boulevard. The case began as an ordinary eminent domain action filed by the DOT pursuant to chapters 73 and 74, Florida Statutes (1997) as part of a project to improve the intersection.[1] The property owners, however, contend that the DOT has actually taken more property rights than it has expressly declared, i.e., that the project will cause the closing of the shopping center's southern entrance on Biscayne Boulevard and such results, inter alia, in a substantial diminution of access for which compensation must be paid. We reverse.
The shopping center was developed with five entrances, two on Ives Dairy Road and three on Biscayne Boulevard. Prior to the DOT's project the southern exit on Biscayne Boulevard allowed northbound travelers to see and access the area of the shopping center which contained a Burger King, a Hooters, and NationsBank. The main (middle) entrance (lying between the northern and southern exits on Biscayne *11 Boulevard) allowed ingress from north and south, as well as egress by a right turn out to the north, where a U-turn was permitted at 207th Street. The northern exit on Biscayne Boulevard allowed only a right turn in, and right turn out. The two Ives Dairy Road exits (one on the east, one on the west) each allowed east and west access.
After the DOT's construction, on Ives Dairy Road the eastern entrance will continue to allow travel in all directions. Customers exiting to the west thereon will have an additional choice, however. In addition to traveling west on a "service road," they will have the option of proceeding up new, elevated lanes of Ives Dairy Road, to Biscayne Boulevard where the elevation of both roads is approximately 40 feet. Additionally the eastern entrance will include control by a traffic light, which will be synchronized with two other traffic lights at nearby intersections. The western entrance on Ives Dairy Road will be placed on the frontage road (one-way west).
On Biscayne Boulevard, after the DOT's construction the southern exit (the subject of the inverse condemnation contention) will face a 27-foot-high barrier (elevated lanes) and be closed. The main (middle) Biscayne Boulevard entrance will continue to have access as it will be converted into a ramp and elevated to meet the elevated Biscayne Boulevard, which at that juncture will be approximately eight feet above grade (having descended from the height of 40 feet at its intersection with Ives Dairy Road).
Based on these facts the trial court concluded that the closing of the southern entrance on Biscayne Boulevard "has substantially diminished the quality of access [to the shopping center] when considering the remaining access to the property which has, itself, been changed and diminished as a result of the taking made by the DOT in its eminent domain action." For the reasons which follow, it is our conclusion that the trial court reached an incorrect result.
The Florida Supreme Court has made it clear that there is a right to compensation when governmental action deprives a property owner of all or substantially all access to its property. Palm Beach County v. Tessler, 538 So.2d 846 (Fla.1989). In reaching this conclusion the supreme court stated:
"The county argues that unless the property owner has been deprived of all access, the law of eminent domain does not recognize that a taking has occurred. Respondents contend that a taking has occurred when any portion of the access has been eliminated and that the suitability of the remaining access may be taken into account in the assessment of compensation. We reject both positions as being extreme."
Tessler, at 847.
The court went on to note:
"It is not necessary that there be a complete loss of access to the property. However, the fact that a portion or even all of one's access to an abutting road is destroyed does not constitute a taking unless, when considered in light of the remaining access to the property, it can be said that the property owner's right of access was substantially diminished. The loss of the most convenient access is not compensable where other suitable access continues to exist."
Tessler, at 849.
In State Dept. of Transp. v. Kreider, 658 So.2d 548, 549 (Fla. 4th DCA 1995) the Fourth District Court of Appeal while dealing with inverse condemnation made an observation to be kept in mind:
"Before and after Tessler, the supreme court has narrowly applied the concept of compensable `loss of access.'"
The fourth district court reviewed various cases in reaching this conclusion, including Weaver Oil Co. v. City of Tallahassee, 647 So.2d 819 (Fla.1994). In Weaver Oil the supreme court was confronted with a situation in which the City of Tallahassee had *12 filed an eminent domain action to facilitate a road widening. As part of the project the city constructed a grass traffic control island in the city's street right-of-way. Because of the configuration of the control island, one of two means of access to Weaver Oil's gas station and convenience store was reduced in width from 44 feet to 27 feet at its narrowest point. The control island was not related to the taking of any of Weaver Oil's land, the island being built entirely within the city owned right-of-way. Weaver Oil contended that it was entitled to damages[2] because it had suffered a compensable taking of its right of access from the street. The supreme court acknowledged that a taking may occur when there is a substantial loss of access. However, in denying compensation to Weaver Oil, the court reaffirmed its holding in Anhoco Corp. v. Dade County, 144 So.2d 793 (Fla.1962), that a taking does not occur when government merely regulates access to property under its police power, such as specifying the location of driveways in and out of abutting property, prohibiting U-turns or left turns, or establishing one-way traffic. The supreme court concluded:
"We find that under the uncontroverted facts in this case Weaver Oil suffered no substantial loss of access from Tennessee Street as a matter of law. The City's construction of a traffic control island on City-owned right-of-way is a valid exercise of the police power. Furthermore, the reduction in width of one of Weaver Oil's means of access occasioned by the construction of the traffic control island is likewise a valid exercise of the police power not unlike the power to establish one-way roads, location of driveways, and prohibitions against U turns approved by this Court in Anhoco. Because of these facts, this case is more analogous to Division of Administration v. Capital Plaza, Inc., 397 So.2d 682 (Fla.1981)(no taking of access occurred when the governing body constructed an impassable median in the center of the street adjacent to a service station), than it is to Tessler and its predecessors. We find that the construction of a traffic control island in the instant case on City-owned right-of-way was a proper exercise of the police power and that there was no taking...."
Weaver Oil, at 822.
The supreme court reaffirmed its rule set out in Tessler:
"It is important to emphasize again what we stated in Tessler: a taking may occur where there is a `substantial loss of access', but `the fact that a portion or even all of one's access to an abutting road is destroyed does not constitute a taking unless, when considered in light of the remaining access to the property, it can be said that the property owner's right of access was substantially diminished.'" [emphasis by supreme court].
Weaver Oil, at 821-22.
The subject shopping center property has lost a portion of its access by the closing of its southern entrance which abutted Biscayne Boulevard. It retains four other entrances (including the main entrance) which continue to allow access to the shopping center from both Ives Diary Road and Biscayne Boulevard (two each). The various exercises of the police power (including control of U-turns and left turns, installation of synchronized traffic control signals, and construction of elevated lanes to aid in correcting dangerous conditions at this intersection) are clearly for the purposes of safety and traffic flow regulation. Under Weaver Oil and Anhoco they are not compensable. Even if they were compensable they do not individually, collectively, or in conjunction with the closing of the southern exit, cause a substantial loss of access. As noted by the trial court, the eastern Ives Dairy Road access will be controlled by synchronous traffic lights, provide an additional egress option (exit into the elevated lanes), and will be *13 available for additional traffic caused by the closing of the southern entrance on Biscayne Boulevard. There is no "Tessler taking" of access.
The property owners have also contended, and the trial court agreed, that the DOT took their property's light, air and view[3] (or at least some light, air and view) by the design and construction of the project's elevated lanes, which at the point of the closed exit will be approximately 27 feet in height. For the following reasons we conclude that the trial court reached the wrong result as to this contention.
We start our analysis with the rather straight-forward result in State of Fla., Dep't of Transportation v. Weggie's Banana Boat, 576 So.2d 722 (Fla. 2d DCA 1991). Therein the second district court denied Weggie's claim for its premises' loss of visibility to passing motorists caused by a 23-foot wall and roadway. The court briefly and unequivocally held, at 724:
"Furthermore, any decrease in visibility... Weggie's suffered as a result of the overall design of the project is not compensable."
The property owners here are in the same boat as Weggie's.
Not put off by the Weggie's holding, the property owners cite the later second district court decision in Lee County v. Kiesel, 705 So.2d 1013 (Fla. 2d DCA 1998). In Kiesel the court did indeed hold to be compensable a loss of view from Kiesel's property even though none of Kiesel's property was taken. Involved was the construction of a bridge over the Caloosahatchee River, which bridge caused the loss of Kiesel's common law riparian right to an unobstructed view of the water. The second district court observed: "These rights constitute property, which the government may not take or destroy without paying just compensation to the owners." Kiesel, at 1015.
Riparian rights are a special breed of property rights, differing from non-riparian rights as demonstrated by Hayes v. Bowman, 91 So.2d 795 (Fla.1957). Hayes was a battle between several private property owners over the extent of their riparian and non-riparian rights of view. The supreme court first discussed riparian rights of view, stating at 801:
"An upland owner must in all cases be permitted a direct, unobstructed view of the Channel and as well a direct, unobstructed means of ingress and egress over the foreshore and tidal waters to the Channel. If the exercise of these rights is prevented, the upland owner is entitled to relief."[4] [e.s.]
The supreme court then turned its attention to non-riparian views, stating at 801:
"It is true as appellants allege that they will be deprived of a view of the `bright, white tower of Stetson Law School which shines as a beacon of learning on the eastern horizon.' We are nonetheless impelled to the thought that a view of that splendid institution of learning, so ably headed now by a former member of this Court, is not a special riparian right guaranteed to appellants and those similarly conditioned."[5]
The distinction between riparian and non-riparian rights is a clear one. Lost riparian rights always entitle the owner to relief; as a consequence they do not assist in determining taking and compensability when non-riparian rights are *14 involved and may or may not be compensable.
The property owners also direct our attention to Benerofe v. State Road Dep't, 217 So.2d 838 (Fla.1969) cited with approval and quoted in Tessler:
"[W]e agree that even when the fee of a street or highway is in a city or a public highway agency, the abutting owners have easements of access, light, and air from the street or highway appurtenant to their land, and unreasonable interference therewith may constitute a taking... requiring compensation therefor." [e.s.]
Tessler, at 848; Benerofe, at 839.
Both Tessler and Benerofe instruct us that the agency controlling the street may in fact interfere with easements of light, air, and view without its constituting a taking so long as the interference is reasonable. In applying this holding of Tessler and Benerofe to the instant case, the "interference," i.e., the elevation of the lanes is not a taking of light, air, or view (or visibility). Reducing the traffic distress at this intersection by elevated lanes is certainly within the discretion of the DOT and is well within the bounds of reason.
We find as a matter of law[6] that the closing of the southern Biscayne Boulevard exit, when considering the remaining access to the property, is not a substantial loss of access.[7] We also conclude that there has been no taking of light, air, and view (or visibility). As a result we reverse the trial court's order and remand with instructions to enter judgment for the State Department of Transportation on the inverse condemnation claim. Having concluded that there is no taking and thus no basis for inverse condemnation, we deny the various appellees' requests for attorney's fees.[8]
Reversed and remanded.
NOTES
[1] Our recitation of the facts comes from the findings of the trial court as set out in the order appealed.
[2] Business damages, a distinction not relevant here.
[3] By "view" we believe the properly owners mean the "visibility" of the shopping center from off premises, not the view from the shopping center to off-site scenes.
[4] Just as Kiesel received relief, in the form of compensation by Lee County.
[5] Justice Thornal's kind comments as to the law school (in Gulfport) are especially kind considering his legal education was gained at the University of Florida. The "former member of the Court," the then Dean of Stetson Law School, was Justice Sebring.
[6] See Weaver Oil Co. v. City of Tallahassee, 647 So.2d at 822 where the supreme court concluded as a matter of law that there was no taking under the facts there involved.
[7] Compare the instant facts to those of Tessler:

"As part of a bridge construction and road widening project, the county planned to construct a retaining wall directly in front of the respondents' property, which would block all access to and visibility of the respondents' place of business from Palmetto Park Road.... The wall will extend to a point approximately twenty feet east of the property. Consequently, the respondents and their customers will only be able to reach the property from Palmetto Park Road by an indirect winding route of some 600 yards through a primarily residential neighborhood."
Tessler, at 847.
[8] See Department of Transp. v. Gefen, 636 So.2d 1345 (Fla.1994).