[No. S132619. Aug. 7, 2006.]

REGENCY OUTDOOR ADVERTISING, INC., Plaintiff and Appellant, v.
CITY OF LOS ANGELES et al., Defendants and Respondents.

508

510

## COUNSEL

Berger & Norton, Manatt, Phelps & Phillips, Michael M. Berger and Edward G. Burg for Plaintiff and Appellant.

Rockard J. Delgadillo, City Attorney, Eduardo A. Angeles, Assistant City Attorney, and D. Timothy Dazé, Deputy City Attorney, for Defendants and Respondents.

Sabine and Morrison and Randal R. Morrison for League of California Cities as Amicus Curiae on behalf of Defendants and Respondents.

## OPINION

**MORENO, J.**—As part of a roadway beautification project in advance of the 2000 Democratic National Convention, the City of Los Angeles (City) planted a number of palm trees on City-owned property along a public street. Plaintiff Regency Outdoor Advertising, Inc. (Regency), claims that the trees made several of its roadside billboards less visible, at least as seen from particular perspectives along the boulevard. Regency asserts that the City must compensate it for the allegedly lessened value of its billboards pursuant to inverse condemnation principles, as well as under state law concerning billboards specifically. The superior court conducted a bench trial on Regency's inverse condemnation claim, ultimately ruling against the firm. The trial court then awarded the City costs and expert witness fees pursuant to Code of Civil Procedure section 998, with this award including an amount attributable to expert witness fees that the City incurred before, as well as after, it extended its offer to compromise.

When Regency appealed, the Court of Appeal affirmed, resolving the inverse condemnation issue by determining that the property right for which Regency demands compensation—the right to be seen from a public way—simply does not exist under the circumstances presented. The Court of Appeal also rebuffed Regency's reliance on state law pertaining to billboards, reasoning that the planting of palm trees near Regency's displays did not mean that the billboards had been "removed," nor their "maintenance or use . . . limited," as is necessary for compensation under Business and Professions Code section 5412. Finally, the Court of Appeal affirmed the award of costs and fees, in full. We granted review, and now affirm.

With regard to the inverse condemnation issue, we conclude that owners and occupiers of roadside property do not possess a "right to be seen" that requires the payment of compensation for municipal landscaping efforts having no injurious effect on any property rights other than the claimed right to visibility. We also agree with the Court of Appeal that the planting of trees in the vicinity of Regency's billboards did not implicate the compensation requirement set forth in Business and Professions Code section 5412. Finally, we affirm the award of costs and fees, rejecting Regency's arguments that Code of Civil Procedure section 998 categorically does not apply to offers made by defendants in inverse condemnation actions, that the City's offer to compromise was so low as to bar it from the subsequent recovery of costs and fees, and that Code of Civil Procedure section 998 does not authorize an award, to a defendant, of expert witness fees incurred before the defendant extends its offer to compromise.

## I. Factual and Procedural Background

In June 2000, the City undertook a beautification program aimed at enhancing the appearance of Century Boulevard, a primary access route to and from Los Angeles International Airport. As part of this project, the City planted mature palm trees along the north and south sides of the road and in the median of the roadway. This landscaping all occurred on property owned by the City.

At the relevant times, Regency owned numerous billboard facings located near Los Angeles International Airport. Several of these displays lined Century Boulevard, occupying property leased by Regency for commercial advertisement purposes. Regency protested when the City planted the palm trees along the road. While Regency acknowledges that the plantings did not physically occupy any land owned by its lessors, and does not contend that the trees have interfered with ingress to or egress from these parcels, it claims that the trees screened at least six of its billboard facings from motorists

traveling along Century Boulevard. Since fewer people could see its billboards clearly with the trees in the way, Regency argues that the City must compensate it for the supposedly reduced value of the obscured facings.

Regency pursued these arguments by way of an inverse condemnation claim alleged in a complaint filed in Los Angeles Superior Court. Regency subsequently filed an amended complaint that added a claim alleging that the plantings breached a contract between itself and the City, pursuant to which the City had agreed not to obstruct the visibility of Regency's billboards. The superior court granted the City's motion for summary adjudication with regard to the contract claim, but allowed the inverse condemnation claim to go to trial. Prior to this bench trial, the City sent Regency an offer to compromise pursuant to Code of Civil Procedure section 998. This proposal offered to settle the matter by paying Regency $1,000 and removing one of the offending trees. Regency rejected the offer, and the parties proceeded to argue the case.

At trial, the parties agreed about certain facts, but disputed others. The parties stipulated that the palm trees along Century Boulevard were situated on public property owned by the City, "dedicated for public use," but they disagreed about whether the trees, in and of themselves, had lessened the value of Regency's billboards. According to Regency, the trees had occluded several billboard facings so severely that they impaired or destroyed altogether the billboards' ongoing economic value.[1] The City's expert, meanwhile, testified that Regency's billboards remained visible from multiple perspectives along the road even after the trees were in place. This expert testified that the billboards had an apparent value of $4,594,000 before the landscaping and $3,955,000 afterward. However, the City's expert opined that this reduced value was attributable to factors such as a decline in billboard advertising generally and a failure by Regency to aggressively market its billboards after the trees were planted. In his view, the planting of the trees, by itself, did not cause Regency to suffer any unavoidable damages.

The superior court ultimately ruled in the City's favor. The court concluded that Regency had failed to prove that "the loss of visibility, if any, decreased the fair market value of [its] property." The court also determined that

---

[1] Regency's briefing includes two sets of "before" and "after" photographs, depicting two of its billboard facings prior and subsequent to the plantings, as seen from Century Boulevard. The photographs are intended to demonstrate how much more difficult it was for drivers to see Regency's billboards after the City planted its trees. These pictures are misleading, in that the "after" photographs appear to have been taken from a greater distance from the billboards than the "before" pictures had been, a difference that would make Regency's billboard facings less obvious in the "after" photographs regardless of whether any trees had been planted.

"defendant's planting of the trees on Century [Boulevard] as part of the highway beautification project does not amount to a taking of plaintiff's property." In denying Regency's motion for a new trial, the superior court concluded that the "bottom line is that the plaintiff really has not proved a loss, and [plaintiff's evidence] was all hearsay. It was all speculative evidence and not reliable evidence whatsoever." The superior court also awarded the City $99,145.64 in costs and fees, a sum that included an amount attributable to expert witness fees incurred by the City before it extended its offer to compromise.

On Regency's appeal, the Court of Appeal affirmed. With regard to Regency's inverse condemnation claim, the Court of Appeal analyzed numerous California appellate decisions discussing a right to a reasonable view of one's property from a public way, ultimately concluding that a reduction of visibility has only warranted compensation in situations where the government's actions also infringe upon a separate and distinct property right, such as the right of access to and from the road. Addressing Business and Professions Code section 5412, a statute that Regency had not relied upon before the trial court, the Court of Appeal concluded that the City's actions had neither "removed" the firm's billboards nor "limited" their "customary maintenance or use," as is required for compensation under the statute. The Court of Appeal then disposed of Regency's arguments that the City should not have received costs and fees under Code of Civil Procedure section 998, finding the offer to compromise statute applicable to inverse condemnation proceedings, regarding the City's offer to compromise as reasonable under the circumstances, and concluding that the statute allows defendants in the City's position to recover expert witness fees incurred both before and after they extend their compromise offers.

We granted review.

## II. DISCUSSION

The following discussion addresses in turn Regency's arguments that (1) the City has "taken or damaged" its property within the meaning of article I, section 19 of the California Constitution, and therefore must compensate the firm for its claimed losses; (2) Regency's billboards have been "removed," or their "customary maintenance or use" "limited," such that the City must provide compensation under Business and Professions Code section 5412; and (3) the Court of Appeal erred in affirming the award of costs and fees.

### A. *Inverse Condemnation*

■ Article I, section 19 of the California Constitution provides, in pertinent part, that "[p]rivate property may be taken or damaged for public

use only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner."[2] Inverse condemnation actions provide a vehicle for property owners to obtain "just compensation." (*San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 939 [55 Cal.Rptr.2d 724, 920 P.2d 669]; *Baker v. Burbank-Glendale-Pasadena Airport Authority* (1985) 39 Cal.3d 862, 866 [218 Cal.Rptr. 293, 705 P.2d 866].)

In an inverse condemnation action, before the question turns to the amount of compensation due, " 'the property owner must first clear the hurdle of establishing that the public entity has, in fact, taken [or damaged] his or her property . . . .' [Citation.]" (*San Diego Gas & Electric Co. v. Superior Court*, *supra*, 13 Cal.4th at p. 940.) As part of this threshold showing, the plaintiff must demonstrate that the government has "taken or damaged" a cognizable property right. (*Selby Realty Co. v. City of San Buenaventura* (1973) 10 Cal.3d 110, 119–120 [109 Cal.Rptr. 799, 514 P.2d 111]; *Hollister Park Inv. Co. v. Goleta County Water Dist.* (1978) 82 Cal.App.3d 290, 293 [147 Cal.Rptr. 91].) An inverse condemnation plaintiff does not establish that its property has been "taken" or "damaged" merely by showing that government action has somewhat decreased the market value of the property. (*HFH, Ltd. v. Superior Court* (1975) 15 Cal.3d 508, 518 [125 Cal.Rptr. 365, 542 P.2d 237].)

Regency claims that the City's landscaping has damaged its "right of visibility, i.e., the right of the property owner to have the property seen from the adjacent public street." The Court of Appeal, after surveying past decisions by this court and the Courts of Appeal discussing a right to be seen from a public way (e.g., *People v. Ricciardi* (1943) 23 Cal.2d 390 [144 P.2d 799]; *Williams v. Los Angeles Ry. Co.* (1907) 150 Cal. 592 [89 P. 330] (*Williams*); *United Cal. Bank v. People ex rel. Dept. Pub. Wks.* (1969) 1 Cal.App.3d 1 [81 Cal.Rptr. 405]; *Goycoolea v. City of Los Angeles* (1962) 207 Cal.App.2d 729 [24 Cal.Rptr. 719]; *People ex rel. Dept. of Public Works v. Stevenson & Co.* (1961) 190 Cal.App.2d 103 [11 Cal.Rptr. 675]; *People v. Loop* (1954) 127 Cal.App.2d 786 [274 P.2d 885]; see also *People ex rel. Dept. of Transportation v. Wilson* (1994) 25 Cal.App.4th 977 [31 Cal.Rptr.2d 52]), concluded that no prior appellate court in this state had ever recognized a "freestanding" right to be seen from a public road, and resolved that it would not be the first. In determining whether the Court of Appeal correctly rejected Regency's inverse condemnation claim, we begin by examining the nature and contours of this asserted right. (See *Bacich v. Board of Control* (1943) 23 Cal.2d 343, 349 [144 P.2d 818].)

---

[2] The words "or damaged" in article I, section 19 signify "that application of the just compensation provision is not limited to physical invasions of property taken for 'public use' in eminent domain, but also encompasses special and direct damage to adjacent property resulting from the construction of public improvements." (*Customer Co. v. City of Sacramento* (1995) 10 Cal.4th 368, 379–380 [41 Cal.Rptr.2d 658, 895 P.2d 900].)

■ Beginning in the 1800's, American courts began to recognize a number of "abutter's rights" enjoyed by property owners along public roads. (See Wilson, *Billboards and the Right to Be Seen from the Highway* (1942) 30 Geo. L.J. 723, 729–730.) These rights, described as being in the nature of easements and "deduced by way of consequence from the purposes of a public street" (*Perlmutter v. Greene* (1932) 259 N.Y. 327 [182 N.E. 5, 6]), include the right of access to and from the road, and the right to receive light and air from the adjoining street. (See *Eachus v. Los Angeles etc. Ry. Co.* (1894) 103 Cal. 614, 617–618 [37 P. 750]; *Barnett v. Johnson* (1863) 15 N.J. Eq. 481, 487–488; 10A McQuillin, The Law of Municipal Corporations (3d ed. 1999) § 30.65, p. 426; Pepin, *California and the Right of Access: The Dilemma Over Compensation* (1965) 38 So.Cal. L.Rev. 689, 690.) Judicial recognition of these rights derives from the perceived expectations of those who own or purchase property alongside a public street, to the effect that the land enjoys certain benefits associated with its location next to the road. (See *Colberg, Inc. v. State of California ex rel. Dept. Pub. Wks.* (1967) 67 Cal.2d 408, 424 [62 Cal.Rptr. 401, 432 P.2d 3]; *Barnett v. Johnson, supra,* 15 N.J. Eq. at pp. 488–489; *Bohm v. Metropolitan El. Ry. Co.* (1892) 129 N.Y. 576 [29 N.E. 802, 805–808]; *Lohr v. Metropolitan Elevated R. Co.* (1887) 104 N.Y. 268 [10 N.E. 528, 531–532, 4 N.Y. St. 340]; cf. Civ. Code, § 831.) It is well established, however, that abutter's rights are qualified, rather than absolute; a property owner "cannot demand that the adjacent street be left in its original condition for all time." (*People v. Ayon* (1960) 54 Cal.2d 217, 223 [5 Cal.Rptr. 151, 352 P.2d 519]; see also *Brown v. Board of Supervisors* (1899) 124 Cal. 274, 281 [57 P. 82]; cf. *Albers v. County of Los Angeles* (1965) 62 Cal.2d 250, 265 [42 Cal.Rptr. 89, 398 P.2d 129].)

■ Regency claims that it possesses an abutter's right to have its billboards seen from the adjacent public road. Cases discussing whether abutter's rights include a right to maintain the visibility of property adjoining a public way typically fall within one of three categories. The first and most ancient class of cases involves private parties who place, within or along a street, an obstruction that impairs the visibility of roadside property. Courts have sometimes treated these impediments as akin to nuisances and afforded relief to the abutting landowner. The second and third categories of cases both involve public defendants, and sound in eminent domain or inverse condemnation rather than in nuisance. The second type of dispute involves physical takings of private property, or substantial impairments of the access rights enjoyed by abutting landowners, that also happen to reduce the visibility of the affected private property. In this second scenario, some courts have identified a "right to be seen," regarding the lost visibility as a type of damage associated with the physical taking or loss of access. The third set of

cases concerns government action that impairs only the visibility of abutting property, without infringing upon any other recognized property right. In this latter context—typified by the present case—the virtually unanimous rule provides that there is no freestanding right to be seen, and that the government need not pay compensation for any lessened visibility. A more detailed discussion of these three scenarios follows.[3]

First, some courts have invoked a "right to visibility" in situations in which a private party has obstructed a road or sidewalk so as to substantially impair the visibility of an abutting business's wares or signage. (See, e.g., *First Nat. Bank v. Tyson* (1902) 133 Ala. 459 [32 So. 144, 150]; *Perry v. Castner* (1904) 124 Iowa 386 [100 N.W. 84, 87]; *Bischof v. Merchants' Nat. Bank* (1906) 75 Neb. 838 [106 N.W. 996, 997–998]; but cf. *Hay v. Weber* (1891) 79 Wis. 587 [48 N.W. 859, 860] [denying the existence of any independently compensable visibility right where the defendant's bay window did not affect access to the plaintiff's store].)[4] These obstructions have been regarded as tantamount to nuisances, susceptible to attack by an aggrieved landowner upon an appropriate showing of harm. (See, e.g., *Bischof v. Merchants' Nat. Bank, supra*, 106 N.W. at p. 997.)

In *Williams, supra*, 150 Cal. 592, we recognized an enforceable right to be seen under such circumstances. The plaintiff in *Williams* owned a street side retail curio store in Los Angeles. (*Id.* at p. 593.) The defendant, the operator of an electric street railway, built a switching tower on the sidewalk in front of the plaintiff's store. (*Id.* at pp. 593–594.) The superior court denied the plaintiff's request for injunctive relief. (*Id.* at p. 593.) On appeal, though affirming the denial of an injunction (*id.* at p. 597), we acknowledged that

---

[3] This does not exhaust the catalogue of abutter's rights that courts have identified. Some jurisdictions, for example, have regarded property owners as having an affirmative though qualified right to plant and grow shade trees along the street adjacent to their property. (See *Webb v. Strobach* (1910) 143 Mo.App. 459 [127 S.W. 680, 684]; 10A McQuillin, The Law of Municipal Corporations, *supra*, §§ 30.66, 30.67, pp. 428–432, 432–434.)

[4] At the same time, the entrenched rule of general application has provided that absent an agreement to the contrary, no one has a right to an unobstructed view of his or her property, from a road, over another's *private* property. (See, e.g., *Mohr v. Midas Realty Corp.* (Iowa 1988) 431 N.W.2d 380, 383; *Knowles v. Richardson* (K.B. 1670) 184 Eng.Rep. 404, 404; cf. *Katcher v. Home S. & L. Assn.* (1966) 245 Cal.App.2d 425, 429 [53 Cal.Rptr. 923] [explaining, in a case involving a claimed right to a view *from* the plaintiffs' property over that of another, that it "has long been established in this state that a landowner has no easement over adjoining land for light and air in the absence of an express grant or covenant"]; *Crofford v. Atlanta, B. & A. R. Co.* (1908) 158 Ala. 288 [48 So. 366, 367] ["No one can doubt the right of a party to build on his own land, even though it entirely cuts off the view, light, and air of his neighbor on the side next to such building"]; but cf. *Prah v. Maretti* (1982) 108 Wis.2d 223 [321 N.W.2d 182].)

lots fronting upon a street possess certain easements in the street in front of and adjacent to the lot, and that "[a]ny obstruction to the use of the street which impairs or destroys these easements is a private injury, special and peculiar to the owner of the lot." (*Id.* at p. 594.) We identified these abutter's easements as the right of access to and from the lot by means of the adjacent street, the right to receive light and air from the street, and "[t]he right to have the street space kept open so that signs or goods displayed in and upon the lot may be seen by the passersby, in order that they may be attracted as customers to patronize the business carried on thereon." (*Id.* at pp. 594–595.)[5]

It is this third asserted right—the "right to have the street space kept open so that signs or goods displayed in and upon the lot may be seen by the passersby" (*Williams, supra,* 150 Cal. at p. 595)—that Regency presently invokes with its inverse condemnation claim.

Second, courts also have recognized a compensable visibility interest when government action that includes a partial physical taking of a landowner's property impairs the visibility of its remainder, as seen from the adjacent road. (See, e.g., *People v. Ricciardi, supra,* 23 Cal.2d at p. 399; *People v. Loop, supra,* 127 Cal.App.2d at p. 803; see also *8,960 Sq. Feet v. Dept. of Transp.* (Alaska 1991) 806 P.2d 843, 848; *State by Humphrey v. Strom* (Minn. 1992) 493 N.W.2d 554, 561; *State by Com'r v. Weiswasser* (1997) 149 N.J. 320 [693 A.2d 864, 876]; but see *State v. Lavasek* (1963) 73 N.M. 33 [385 P.2d 361, 364–365]; *State v. Schmidt* (Tex. 1993) 867 S.W.2d 769, 774 [37 Tex. Sup. Ct. J. 47].)[6] In these cases, the "right to be seen" bears upon the value of the residual parcel. In other words, the diminution of visibility in these circumstances does not, by itself, result in the taking or damaging of property, but once a physical taking is established, such diminution is taken

---

[5] *Williams, supra,* 150 Cal. 592, however, did leave open the possibility that the landowner might lack enforceable abutter's rights were it shown that the railway's switching tower, for which the city had implicitly granted a license, necessarily *had* to be placed on the sidewalk or street, instead of upon nearby private property. (*Id.* at pp. 595–596.)

[6] Certain jurisdictions draw a distinction between situations in which the improvement that blocks visibility is located on property taken from the landowner, and circumstances in which the occluding improvement is located on property owned by someone else, with the landowner's property merely being taken as another part of the overall project. (See, e.g., *8,960 Sq. Feet v. Dept. of Transp., supra,* 806 P.2d at p. 848.) Pursuant to Code of Civil Procedure section 1263.420, this state recognizes no such distinction; however, this does not free the property owner from demonstrating *some* physical taking or similar, distinct impairment of its property in the first instance to justify compensation for an attendant loss of visibility.

into account in determining damages in a condemnation or inverse condemnation proceeding.[7]

Third, the government may take action having the sole allegedly injurious effect of reducing the visibility of roadside property as seen from the street. The virtually unanimous rule applied in this class of cases provides that any such impairment to visibility does not, in and of itself, constitute a taking of, or compensable damage to, the property in question. (See *Reid v. Jefferson County* (Ala. 1995) 672 So.2d 1285, 1290; *8,960 Sq. Feet v. Dept. of Transp., supra*, 806 P.2d at p. 848; *Troiano v. Colorado Department of Highways* (1969) 170 Colo. 484 [463 P.2d 448, 455]; *Moreton Rolleston, Jr. Living Trust v. DOT* (2000) 242 Ga.App. 835 [531 S.E.2d 719, 722]; *Stagni v. State ex rel. Dept. of Transp.* (La.Ct.App. 2002) 812 So.2d 867, 871; *Malone v. Commonwealth* (1979) 378 Mass. 74 [389 N.E.2d 975, 979]; *State by Humphrey v. Strom, supra*, 493 N.W.2d at p. 561; *Kansas City v. Berkshire Lumber Company* (Mo. 1965) 393 S.W.2d 470, 474–475; *State by Com'r v. Weiswasser, supra*, 693 A.2d at p. 876; *Perlmutter v. Greene, supra*, 182 N.E. at p. 6; *Adams Outdoor Adv. v. Dept. of Transp.* (1993) 112 N.C.App. 120 [434 S.E.2d 666, 668]; *Filler v. City of Minot* (N.D. 1979) 281 N.W.2d 237, 244; *In re Condemnation by Delaware River Port Authority* (Pa.Commw.Ct. 1995) 667 A.2d 766, 768; *Outdoor Advertising Ass'n of Tenn. v. Shaw* (Tenn.Ct.App. 1980) 598 S.W.2d 783, 788; *Randall v. City of Milwaukee* (1933) 212 Wis. 374 [249 N.W. 73, 76].)[8]

Courts gainsaying any compensable "right to be seen" absent a physical taking, or an infringement upon the right of access, have advanced different

---

[7] Two Court of Appeal decisions (*United Cal. Bank v. People ex rel. Dept. Pub. Wks., supra*, 1 Cal.App.3d at p. 7; *Goycoolea v. City of Los Angeles, supra*, 207 Cal.App.2d at p. 735) identified a visibility right in situations in which there was no physical taking of private property, but there was a substantial impairment of the right of access to and from the affected parcels due to roadwork by the government. While these decisions discuss a "right" to visibility, in both cases the reduced visibility was tethered to a compensable claim of impaired physical access. (See *United Cal. Bank v. People ex rel. Dept. Pub. Wks., supra*, 1 Cal.App.3d at p. 7; *Goycoolea v. City of Los Angeles, supra*, 207 Cal.App.2d at pp. 735–736.) Both *United Cal. Bank* and *Goycoolea*, therefore, can be reconciled with cases involving partial physical takings, in that these two decisions considered a diminution of visibility in ascertaining the ramifications of government action that also took or damaged a properly compensable property interest. Contrary to Regency's characterization of these decisions, neither *United Cal. Bank* nor *Goycoolea* stands for the proposition that a reduction of visibility, on its own, requires the payment of compensation.

[8] One court has concluded that the government may interfere with an easement of view without giving rise to a taking if said "interference is reasonable." (*State, Dept. of Transp. v. Suit City* (Fla.Dist.Ct.App. 2000) 774 So.2d 9, 14.) Another jurisdiction has recognized a cognizable visibility interest in displaying wares situated or services offered on the roadside premises, but not in using abutting property to advertise goods or services located or offered off-site. (*Kelbro, Inc. v. Myrick* (1943) 113 Vt. 64 [30 A.2d 527, 529–531].)

justifications for their shared conclusion. Some jurists emphasize that construction and landscaping that may limit visibility along a street lies within the contemplation of those who dedicate part of their property to, or who settle along, public roads. Given this foreseeability, it works no unanticipated unfairness to refuse compensation when such obstructions come into being as part of improvements to the road. " 'What makes street frontage valuable is the fact that people travel over the street, and the abutter cannot complain of improvements that facilitate such travel. He must anticipate that such improvements will be made . . . .' " (*Kansas City v. Berkshire Lumber Company, supra,* 393 S.W.2d at p. 475; cf. *Palmer v. Larchmont Electric Co.* (1899) 158 N.Y. 231 [52 N.E. 1092, 1093] [stating that the installation of lights along city streets "is deemed one of the uses for which the land was taken as a public highway"].)

Another line of decisions stresses a related consideration, namely the government's authority to maintain and improve the road system. Pursuant to this view, "[i]n the exercise of such supervision and control [over public roads] doubtless [the government] may plant shade trees along the road to give comfort to motorists and incidentally to improve the appearance of the highway. By so doing [the government] aims to make a better highway than a mere scar across the land would be. If trees interfere with the view of the adjacent property from the road, no right is interfered with." (*Perlmutter v. Greene, supra,* 182 N.E. at p. 6; see also *Reid v. Jefferson County, supra,* 672 So.2d at p. 1290; *Outdoor Advertising Ass'n of Tenn. v. Shaw, supra,* 598 S.W.2d at p. 788 ["the State may with impunity interfere with the view of motorists to adjacent property so long as the interference is the result of a bona fide program of highway beautification"].)

A similar but slightly more nuanced view regards the rights to reasonable ingress and egress as the only abutter's rights warranting compensation for their abridgement when the government acts to improve a public road. "Generally, there are two primary purposes for the existence of a street or highway. The first is to provide a means of passage for the public and the second is to provide a means of access to and egress from abutting lands. Any other benefits to abutting lands that may result from the existence of a street or highway are merely incidental to such existence and do not generally represent reasons for its establishment as a public highway. [¶] Hence, in our opinion, any rights which owners of such abutting land may have with respect to such other benefits are necessarily held subject to the public right to make improvements for accomplishment of the foregoing two primary purposes for the existence of a street or highway." (*State v. Preston* (1960) 170 Ohio St. 542 [166 N.E.2d 748, 751–752] [discussing visibility from and of roadside property].)

█ We follow the weight of authority and conclude that Regency has no visibility right warranting compensation here. It bears emphasis that *Williams*, *supra*, 150 Cal. 592, the first decision in this state recognizing any "right to be seen," qualified its holding by noting that "[a]*ny obstruction to the use of the street* which impairs or destroys [an abutter's] easements is a private injury." (*Id.* at p. 594, italics added.) Our careful phrasing implied that activity that comports with the fundamental purposes served by the roads *does not* produce a private injury. The planting of trees along a road is, in general, fully "consistent with [the road's] use as an open public street" (*McNair v. McNulty* (2002) 295 A.D.2d 515 [744 N.Y.S.2d 438, 439]), and in fact may enhance both travel and commerce along the street. Regency has not argued and cannot claim that this general rule does not hold true here, and that the trees at issue have subverted or restricted either of the fundamental purposes that roads serve. (See *State v. Preston*, *supra*, 166 N.E.2d at pp. 751–752.) No one has complained that the trees have made it more difficult to gain access to or from, or to travel along, Century Boulevard.

Moreover, Regency cannot claim unfair surprise from the plantings. Local governments have long planted trees along roads for aesthetic reasons, to lessen the burdens of climate, and for other salubrious purposes. "The maintenance of trees in a street for the purpose of ornament and shade is a proper street use, sanctioned both by statute and the custom of the country." (*Donahue v. Keystone Gas Co.* (1905) 181 N.Y. 313 [73 N.E. 1108, 1109]; see also L.A. Res. No. 89,450 (Jan. 21, 1998) [resolving that "[s]treet trees are recognized as an essential part of the City of Los Angeles urban forest infrastructure" and announcing a goal of achieving "an optimum degree of canopy cover in order to shade City streets"]; *McNair v. McNulty*, *supra*, 744 N.Y.S.2d at p. 439 ["The maintenance of trees in a street for the purposes of ornament and shade has been determined to be a proper street use"].) Anyone who purchases or occupies property along a public road is presumed aware of this heretofore undisturbed—indeed, typically welcomed—custom. When such landscaping is involved, at least absent unusual circumstances not present here, denying compensation for reduced visibility, in and of itself, without an additional showing of a partial physical taking or substantially impaired access, visits no unfairness upon property owners or others who occupy roadside parcels.

█ The foregoing, on its own, establishes that the superior court and Court of Appeal properly rejected Regency's inverse condemnation claim. But we also observe in passing that there has been no showing here that the City's landscaping reduced the value of any of the parcels abutting Century Boulevard upon which Regency's billboards sit. Nor can we infer any such damage, for "[i]f [a] street is improved so as to be more useful, or ornamented so as to be more beautiful, the public is benefited generally and

the abutter is benefited specially." (*Donahue v. Keystone Gas Co., supra,* 73 N.E. at p. 1110.) Meanwhile, even if one were to assume that the trees prevented abutting owners from displaying billboards on their property, this would represent, at worst, one manifestation of "traditional land-use regulations" that "have long been held to be valid exercises of the city's traditional police power, and do not amount to a taking merely because they might incidentally restrict a use, diminish the value, or impose a cost in connection with the property. [Citations.]" (*Ehrlich v. City of Culver City* (1996) 12 Cal.4th 854, 886 [50 Cal.Rptr.2d 242, 911 P.2d 429].)

■ Regency, of course, claims a more specific and severe impairment of the particular "strand" it has severed from the bundle of rights enjoyed by its lessors. Through its lease agreements Regency has acquired a property interest acutely sensitive to impairments to visibility. But as a general matter, "we do not believe that a property owner, confronted with an imminent property regulation, can nullify . . . a legitimate exercise of the police power by leasing narrow parcels or interests in his property so that the regulation could be characterized as a taking only because of its disproportionate effect on the narrow parcel or interest leased." (*Adams Outdoor Advertising v. East Lansing* (2000) 463 Mich. 17 [614 N.W.2d 634, 639]; see also *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency* (2002) 535 U.S. 302, 327 [152 L.Ed.2d 517, 122 S.Ct. 1465] [reiterating that "taking" jurisprudence " 'does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated' "].) As previously established, Regency and the owners of the property upon which its billboards sat bargained in the shade of the government's well-established prerogative to plant trees on its own property. Regency now would have us foist onto the public what was appropriately a subject for negotiation between the firm and its lessors. We perceive no constitutional requirement that the public absorb these costs.

■ All in all, we conclude that the Court of Appeal was correct and that Regency has not advanced a property right warranting compensation here. Where, as in this case, an impairment of a billboard's visibility is the sole harm alleged from a municipal landscaping project occurring on city-owned property, eminent domain and inverse condemnation principles do not require the payment of compensation.

### B. *Business and Professions Code Section 5412*

Regency also claims that Business and Professions Code section 5412, part of the Outdoor Advertising Act (Bus. & Prof. Code, § 5200 et seq.), directs that it receive compensation for the allegedly lessened value of its billboards. Section 5412 provides, in pertinent part, "Notwithstanding any other provision of this chapter, no advertising display which was lawfully erected

anywhere within this state shall be compelled to be removed, nor shall its customary maintenance or use be limited, whether or not the removal or limitation is pursuant to or because of this chapter or any other law, ordinance, or regulation of any governmental entity, without payment of compensation . . . ." Regency asserts that the City's plantings have effectively "removed," or "limited" the use of its billboard facings, requiring the payment of compensation.

■ In interpreting Business and Professions Code section 5412, "we look to the intent of the Legislature in enacting the law, 'being careful to give the statute's words their plain, commonsense meaning. [Citation.] If the language of the statute is not ambiguous, the plain meaning controls and resort to extrinsic sources to determine the Legislature's intent is unnecessary.' [Citation.]" (*In re Jennings* (2004) 34 Cal.4th 254, 263 [17 Cal.Rptr.3d 645, 95 P.3d 906].) "If, however, the statutory language lacks clarity, we may resort to extrinsic sources, including the ostensible objects to be achieved and the legislative history." (*People v. Walker* (2002) 29 Cal.4th 577, 581 [128 Cal.Rptr.2d 75, 59 P.3d 150].)

The language within Business and Professions Code section 5412 regarding the "removal" of billboards does not apply here. The planting of trees close to a billboard does not "remove" the display, for obvious reasons. Trees or no, the billboard remains in place. Whether the City's actions have "limited" the "customary maintenance or use" of the billboards at issue poses a more difficult interpretive question. "Limit," when used as a verb, means "to assign to or within certain limits" or "to set bounds or limits to." (Webster's 3d New Internat. Dict. (2002) p. 1312, col. 3.) Thus, Business and Professions Code section 5412 could be construed as stating, in pertinent part, "nor shall [a billboard's] customary maintenance or use be set or assigned to or within certain bounds or limits," without payment of compensation. Under this interpretation of the statute, the compensation requirement would seem to apply only to government action specifically directed at limiting the "maintenance or use" of a billboard or billboards. Furthermore, the statute's enumeration of specific methods of billboard control that necessitate compensation—"law[s], ordinance[s], [and] regulation[s]"—suggests that the Legislature was principally, though perhaps not exclusively (see Bus. & Prof. Code, § 5412.6), concerned with the control of billboards through positive law, not prosaic government activity of the sort at issue here. However, as it is also possible that the statute sweeps more broadly to encompass *any* government action with the *effect* of restricting a billboard's "customary maintenance or use," perhaps including actions that incidentally impair a billboard's visibility, we must turn to other sources, including the history of Business and Professions Code section 5412, to ascertain the intent of the enacting Legislature.

Business and Professions Code section 5412 is but one component of the state's regulatory scheme governing billboards. Since 1967, the Outdoor Advertising Act has provided for the payment of compensation upon the removal of certain billboards, as needed to satisfy federal highway beautification law. (See Bus. & Prof. Code, former § 5288.3a, enacted by Stats. 1967, ch. 1408, § 21, pp. 3313–3314, and repealed by Stats. 1970, ch. 991, § 1, p. 1764; Bus. & Prof. Code, former § 5412, as enacted by Stats. 1970, ch. 991, § 2, pp. 1764, 1776–1777.) As previously codified, this statutory compensation requirement only pertained to those billboards that had been removed in order to comply with federal law and thus protect California's receipt of highway funds. (See Bus. & Prof. Code, former § 5288.3a, enacted by Stats. 1967, ch. 1408, § 21, pp. 3313–3314, and repealed by Stats. 1970, ch. 991, § 1, p. 1764; former Bus. & Prof. Code, § 5412, as enacted by Stats. 1970, ch. 991, § 2, pp. 1764, 1776–1777; *Metromedia, Inc. v. City of San Diego* (1980) 26 Cal.3d 848, 879 [164 Cal.Rptr. 510, 610 P.2d 407].) These earlier statutes also did not require compensation for "limitations" placed on an advertising display's maintenance or use.

In 1982, however, the Legislature repealed and reenacted Business and Professions Code section 5412 (Stats. 1982, ch. 494, §§ 3–4, p. 2112), and in so doing rewrote its compensation language to provide, as it presently does, that "[n]otwithstanding any other provision of this chapter, no advertising display which was lawfully erected anywhere within this state shall be compelled to be removed, nor shall its customary maintenance or use be limited, whether or not the removal or limitation is pursuant to or because of this chapter or any other law, ordinance, or regulation of any governmental entity, without payment of compensation . . . ." The amended statute thus directs the payment of compensation for the removal of billboards lawfully erected anywhere in the state, subject to specific exemptions recognized by the Legislature (see Bus. & Prof. Code, §§ 5412.1, 5412.2, 5412.3), and adds a compensation requirement implicated when the government "limit[s]" the "customary maintenance or use" of a display. (*Id.,* § 5412.)

Curiously, while the committee reports and analyses prepared for the 1982 repeal and reenactment of Business and Professions Code section 5412 discuss the compensation requirement at length insofar as it concerns the removal of billboards, the legislative history is completely silent with regard to any need to pay for limitations placed upon a billboard's "customary maintenance or use." (See, e.g., Assem. 3d reading analysis of Assem. Bill No. 1353 (1981–1982 Reg. Sess.) June 28, 1982, p. 1.) In discussing the fiscal effect of the new provisions, for example, an analysis of the proposed legislation states only that "[l]ocal governments could incur undeterminable state mandated costs to compensate for the required removal of certain outdoor advertising displays. These costs are potentially reimbursable. The

bill contains a general local costs disclaimer." (*Ibid.*) No mention is made of any costs attributable to the "limitation" of billboards.

■ We believe that the requirement in Business and Professions Code section 5412 that the "customary maintenance or use" of a billboard shall not "be limited," "whether or not" by "law, ordinance, or regulation of any governmental entity," "without payment of compensation," does not pertain to municipal landscaping efforts that may incidentally impair the visibility of nearby advertising facings. We premise our conclusion on the following grounds. ■ First, "it is not to be presumed that the legislature in the enactment of statutes intends to overthrow long-established principles of law unless such intention is made clearly to appear either by express declaration or by necessary implication." (*County of Los Angeles v. Frisbie* (1942) 19 Cal.2d 634, 644 [122 P.2d 526]; see also *Torres v. Automobile Club of So. California* (1997) 15 Cal.4th 771, 779 [63 Cal.Rptr.2d 859, 937 P.2d 290].) As detailed in connection with Regency's inverse condemnation claim, no appellate court in this state has ever recognized a right to compensation for impaired visibility, standing alone. Had the Legislature intended to adopt a more generous stance toward those who own and operate billboards, we believe that it would have made its intentions more clear than simply prohibiting the uncompensated "limit[ation]" of a display's "customary maintenance or use."

Likewise, had the Legislature in fact intended to mandate compensation in every situation in which government activity happens to incidentally affect the visibility of a billboard, we do not believe that this point would have gone unremarked upon in the legislative history, particularly in discussions of the fiscal effect of the proposed legislation. Regency argues that the Legislature that repealed and reenacted Business and Professions Code section 5412 adopted a novel compensation requirement for reduced visibility attributable to government action, a mandate that applies regardless of whether the government intended to block the affected billboard or billboards from view. Under this interpretation of the statute, payment would be required not only for the planting of trees, but also in a myriad of other situations, e.g., whenever the government erects a building that partially occludes a nearby billboard. The costs attendant to this new compensation requirement would be considerable. We doubt that a Legislature that actually intended to compel payment for reduced visibility would completely overlook these costs when discussing the statute's fiscal effect.

The arguments Regency advances in favor of a broader interpretation of Business and Professions Code section 5412 are unconvincing. Regency claims to find support for its interpretation of the statute in a section of the Outdoor Advertising Act addressing "landscaped" freeways. Subject to certain exceptions, "no advertising display may be placed or maintained on

property adjacent to a section of a freeway that has been landscaped if the advertising display is designed to be viewed primarily by persons traveling on the main-traveled way of the landscaped freeway." (Bus. & Prof. Code, § 5440; see also *id.*, § 5216 [defining "landscaped freeway"].) Business and Professions Code section 5443, subdivision (b) states that, provided other requirements are also met, the prohibition announced by section 5440 will not bar government entities "from entering into a relocation agreement pursuant to Section 5412 or the [Department of Transportation] from allowing any legally permitted display to be increased in height at its permitted location or to be relocated if a noise attenuation barrier is erected in front of the display or if a building, construction, or structure, including, but not limited to, a barrier, bridge, overpass, or underpass, has been or is then being erected by any government entity that obstructs the display's visibility within 500 feet of the display . . . ." In leveraging this language, Regency notes that government entities may avoid paying compensation under the Outdoor Advertising Act by authorizing the relocation of removed billboards. (Bus. & Prof., § 5412.) According to Regency, by authorizing relocation agreements in situations involving government improvements that obstruct the visibility of advertising displays, Business and Professions Code section 5443, subdivision (b) implicitly recognizes that, absent these agreements, all barriers to visibility erected by the government will otherwise require compensation under section 5412.

Regency reads too much into Business and Professions Code section 5443, subdivision (b). The Legislature enacted the provisions invoked by Regency merely to clarify that, the restrictions on advertising displays along landscaped freeways notwithstanding, the Department of Transportation may allow existing displays to be heightened or moved to alternative locations when certain government projects impair their visibility. (See, e.g., Assem. 3d reading analysis of Assem. Bill No. 2795 (1991–1992 Reg. Sess.) as amended Apr. 6, 1992, pp. 1–2 [discussing the purpose of an earlier version of the statute that related only to visibility problems caused by sound walls].)[9] That the Legislature has specified that the Department of Transportation *may* allow the relocation or raising of a billboard under specified circumstances falls well short of showing that the agency *must* do so in order to avoid the compensation requirement imposed by Business and Professions Code section 5412.

---

[9] This analysis provides, in pertinent part, "When Cal-Trans [*sic*] erects freeway noise abatement walls, many times permitted billboards will be partially or completely covered by the sound walls. Typically, Cal-Trans will deny a billboard owner permission to increase the height of the billboard enough to clear the sound wall and allow unobstructed vision on the basis that the freeway is 'landscaped' and billboards are not permitted on landscaped freeways. [¶] This bill stipulates that the landscape requirements do not prohibit Cal-Trans from increasing the height of a legally permitted sign unless the action would cause a reduction in federal highway funds." (Assem. 3d reading analysis of Assem. Bill No. 2795 (1991–1992 Reg. Sess.) as amended Apr. 6, 1992, pp. 1–2.)

■ To summarize, we conclude that roadway beautification projects that may affect the visibility of nearby billboards, but are not undertaken for the purpose of limiting the "customary maintenance or use" of the displays, do not trigger the statutory compensation requirement. Here, Regency has offered no evidence establishing that the trees at issue were planted along Century Boulevard for the purpose of blocking its billboards from view—indeed, the evidence adduced at trial was to the contrary, with the manager of the landscaping project testifying that the trees had *not* been planted for this reason. Business and Professions Code section 5412 does not apply to these circumstances.

### C. *Code of Civil Procedure Section 998*

The third issue implicated in this appeal involves the trial court's decision, subsequently affirmed by the Court of Appeal, to award the City fees and costs pursuant to Code of Civil Procedure section 998. Regency challenges this award on three grounds. The firm argues that Code of Civil Procedure section 998, subdivision (c)(1) does not apply to inverse condemnation actions; that the trial court abused its discretion in awarding fees and costs because the City's offer to compromise was not extended in good faith, and that the trial court erred in awarding the City expert witness fees incurred prior to the date of its offer to compromise. We conclude that all of Regency's arguments lack merit, and that the award of fees and costs should stand.

■ Code of Civil Procedure section 998 is designed to encourage the settlement of lawsuits before trial. (*T. M. Cobb Co. v. Superior Court* (1984) 36 Cal.3d 273, 280 [204 Cal.Rptr. 143, 682 P.2d 338].) Pursuant to section 998, "[n]ot less than 10 days prior to commencement of trial or arbitration," a party in a case "may serve an offer in writing upon any other party to the action to allow judgment to be taken or an award to be entered in accordance with the terms and conditions stated at that time." (Code Civ. Proc., § 998, subd. (b).) If the party to whom the offer is extended accepts the offer, it is filed with the clerk and judgment is entered accordingly. (*Id.*, subd. (b)(1).) On the other hand, as pertinent here, "If an offer made by a defendant is not accepted and the plaintiff fails to obtain a more favorable judgment or award, the plaintiff shall not recover his or her postoffer costs and shall pay the defendant's costs from the time of the offer. In addition, in any action or proceeding other than an eminent domain action, the court or arbitrator, in its discretion, may require the plaintiff to pay a reasonable sum to cover costs of the services of expert witnesses, who are not regular employees of any party, actually incurred and reasonably necessary in either, or both, preparation for trial or arbitration, or during trial or arbitration, of the case by the defendant." (*Id.*, subd. (c)(1).) Furthermore, "If an offer made by a plaintiff is not

accepted and the defendant fails to obtain a more favorable judgment or award in any action or proceeding other than an eminent domain action, the court or arbitrator, in its discretion, may require the defendant to pay a reasonable sum to cover postoffer costs of the services of expert witnesses, who are not regular employees of any party, actually incurred and reasonably necessary in either, or both, preparation for trial or arbitration, or during trial or arbitration, of the case by the plaintiff, in addition to plaintiff's costs." (*Id.*, subd. (d).)

In challenging the award of costs and fees on the asserted ground that Code of Civil Procedure section 998, subdivision (c)(1) categorically does not apply to inverse condemnation actions, Regency focuses upon the subdivision's proviso that its discretionary language applies to "any action or proceeding other than an eminent domain action."[10] (§ 998, subd. (c)(1).) Emphasizing our description of an inverse condemnation action as " 'an eminent domain proceeding initiated by the property owner rather than the condemner' " (*Customer Co. v. City of Sacramento, supra,* 10 Cal.4th at p. 377, fn. 4), Regency asserts that this exclusion of eminent domain proceedings also encompasses inverse condemnation actions, and applies to the entire subdivision. In so arguing, Regency acknowledges that its interpretation of "eminent domain," as used within Code of Civil Procedure section 998, subdivision (c)(1), was rejected by *Goebel v. City of Santa Barbara* (2001) 92 Cal.App.4th 549, 558–559 [111 Cal.Rptr.2d 901] (*Goebel*), but urges us to disapprove that decision.

*Goebel, supra,* 92 Cal.App.4th 549, was, like this, an inverse condemnation action in which the plaintiffs rejected a city's offer to compromise and the trial court ultimately awarded the city costs and expert witness fees. The plaintiffs challenged the award of fees, arguing that Code of Civil Procedure section 998 does not apply to inverse condemnation claims. The *Goebel* court, recognizing that Code of Civil Procedure section 998, subdivision (c)(1) refers only to eminent domain actions, stated that "[t]he validity of the court's fee award depends on whether 'eminent domain,' as used in section 998, should be read to include 'inverse condemnation.' " (*Goebel, supra,* 92 Cal.App.4th at p. 558.) The court then noted that inverse condemnation and eminent domain proceedings "are not synonymous, and the terms are not interchangeable. In an eminent domain proceeding, a public entity files suit to condemn a piece of private property that is necessary for a public use. In an inverse condemnation action, the property owner seeks just compensation from a public entity that has taken or damaged property for a public purpose. [Citation.] [¶] If the Legislature had intended to restrict the use of section 998

---

[10] Code of Civil Procedure section 998, subdivision (g)(1) also provides that the statute does not apply to offers made by plaintiffs in eminent domain actions.

offers in all inverse condemnation actions, we believe it would have done so explicitly." (*Goebel, supra,* 92 Cal.App.4th at pp. 558–559.)

We agree with *Goebel.* While in certain circumstances it may be appropriate for courts to apply, in inverse condemnation actions, principles developed in connection with eminent domain proceedings (see *Pacific Bell v. City of San Diego* (2000) 81 Cal.App.4th 596, 602 [96 Cal.Rptr.2d 897]), as the *Goebel* court recognized, inverse condemnation and eminent domain proceedings are not identical. A property owner initiates an inverse condemnation action, while an eminent domain proceeding is commenced by a public entity. (*Klopping v. City of Whittier* (1972) 8 Cal.3d 39, 43 [104 Cal.Rptr. 1, 500 P.2d 1345].) Eminent domain actions typically focus on the amount of compensation owed the property owner, since by initiating the proceeding the government effectively acknowledges that it seeks to "take or damage" the property in question. (*San Diego Gas & Electric Co. v. Superior Court, supra,* 13 Cal.4th at pp. 939–940.) In an inverse condemnation action, by contrast, " 'the property owner must first clear the hurdle of establishing that the public entity has, in fact, taken [or damaged] his or her property before he or she can reach the issue of "just compensation." ' [Citation.]" (*Id.* at p. 940; see also *Beaty v. Imperial Irrigation Dist.* (1986) 186 Cal.App.3d 897, 903–904 [231 Cal.Rptr. 128] [discussing the differences between inverse condemnation actions and eminent domain proceedings].)

We doubt that these differences have been lost on the Legislature. The Law Revision Commission comments to the Eminent Domain Law, Code of Civil Procedure section 1230.010 et seq., discern a difference between the two forms of action, as they provide that the law's provisions "are intended to supply rules only for eminent domain proceedings" with "[t]he law of inverse condemnation . . . left for determination by judicial development." (Cal. Law Revision Com. com., 19 West's Ann. Code Civ. Proc. (1982 ed.) foll. § 1230.020, p. 395.) Moreover, the Legislature is fully capable of referring to inverse condemnation actions by name in connection with the award of costs; Code of Civil Procedure section 1036 pertains expressly to the award of costs in inverse condemnation proceedings that result in compensation being paid to the plaintiff. We conclude from these indicia that the Legislature perceives a difference between eminent domain and inverse condemnation, and that the Legislature did not intend for its reference to eminent domain in Code of Civil Procedure section 998, subdivision (c)(1), to encompass inverse condemnation proceedings.[11]

---

[11] Regency also asserts that the just compensation requirement under article I, section 19 of the California Constitution prohibits the award of costs or fees under Code of Civil Procedure section 998, subdivision (c)(1) against a plaintiff in an inverse condemnation action that has established that it has suffered compensable harm (see *Orpheum Bldg. Co. v. San Francisco Bay Area Rapid Transit Dist.* (1978) 80 Cal.App.3d 863, 878 [146 Cal.Rptr. 5]), and that section 998

 Next, Regency asserts that the City's offer of $1,000 and removal of one of the trees was "unreasonable," and therefore provided no basis for an award of fees and costs. Regency's argument stems from decisions holding that, to provide grounds for an award under Code of Civil Procedure section 998, an offer to compromise must be extended in "good faith," meaning that the offer "must be realistically reasonable under the circumstances of the particular case" (*Wear v. Calderon* (1981) 121 Cal.App.3d 818, 821 [175 Cal.Rptr. 566]), and "carry with it some reasonable prospect of acceptance" (*Elrod v. Oregon Cummins Diesel, Inc.* (1987) 195 Cal.App.3d 692, 698 [241 Cal.Rptr. 108]). Assuming without deciding that Code of Civil Procedure section 998 entails such a requirement, we conclude that the trial court did not abuse its discretion in awarding fees and costs.

Throughout the proceedings below, the City pursued ultimately meritorious arguments that provided a complete defense to Regency's claims. Although, at the time of the City's offer, the superior court had denied its motion for summary judgment or, in the alternative, summary adjudication insofar as it pertained to Regency's inverse condemnation claim, we disagree with Regency's opinion that this setback required the City to issue an offer more generous than the one it extended. Given Regency's assertions that the impaired visibility of its billboards cost it millions in damages, the City's offer to remove one of the trees that it had planted possessed genuine value. Moreover, the City maintained throughout the litigation, and the trial court ultimately agreed, that Regency had no compensable right warranting compensation; this lawsuit was not a mere dispute over the extent of damages. (See *Nelson v. Anderson* (1999) 72 Cal.App.4th 111, 134 [84 Cal.Rptr.2d 753] [noting that even a modest offer may be reasonable if an action is completely lacking in merit].) Under the circumstances, we conclude that by offering to remove one of the trees and pay Regency $1,000, the City satisfied whatever good faith requirement may apply to a settlement offer under Code of Civil Procedure section 998.

 Third and finally, Regency argues that the trial court erred in awarding the City expert witness fees, at least to the extent that these fees

cannot be read as authorizing only awards against *unsuccessful* inverse condemnation plaintiffs. Regardless of whether Regency has espied a valid constitutional concern in the context of section 998 with regard to successful inverse condemnation plaintiffs (see *Locklin v. City of Lafayette* (1994) 7 Cal.4th 327, 376 [27 Cal.Rptr.2d 613, 867 P.2d 724]; *City of Los Angeles v. Ricards* (1973) 10 Cal.3d 385, 390–391 [110 Cal.Rptr. 489, 515 P.2d 585]; *Goebel, supra,* 92 Cal.App.4th at p. 559), we disagree with the premise underlying its argument, namely that the existence of a narrow, constitutionally required exception to a statute compels us to rewrite the law in other respects, as would occur here if we were to ignore the difference between eminent domain and inverse condemnation.

were incurred prior to the City's offer to compromise. Regency contends that Code of Civil Procedure section 998, subdivision (c)(1) limits recoverable fees to those incurred *after* an offer is extended. The Court of Appeal below held that, to the contrary, this subdivision authorizes compensation for fees incurred both prior to and after a compromise offer is extended. We agree with the Court of Appeal.

As stated previously, Code of Civil Procedure section 998, subdivision (c)(1), provides in relevant part that "[i]f an offer made by a defendant is not accepted and the plaintiff fails to obtain a more favorable judgment or award, the plaintiff shall not recover his or her postoffer costs and shall pay the defendant's costs from the time of the offer. In addition . . . the court or arbitrator, in its discretion, may require the plaintiff to pay a reasonable sum to cover costs of the services of expert witnesses . . . actually incurred and reasonably necessary in either, or both, preparation for trial or arbitration, or during trial or arbitration, of the case by the defendant." The first sentence quoted above limits recoverable "costs" to those incurred from the time of the offer. The second sentence, which relates to the "costs of the services of expert witnesses," contains no such limitation. The Court of Appeal concluded that the omission in the second sentence was intentional, and that the City was entitled to both preoffer and postoffer expert witness fees.

Regency interprets Code of Civil Procedure section 998, subdivision (c)(1) differently, regarding expert witness fees as one of many "cost" items recoverable only to the extent they are incurred after an offer is extended. While Regency allows that Code of Civil Procedure section 1033.5, which defines "costs" for purposes of Code of Civil Procedure section 998, excludes expert witness fees to the extent that these witnesses were not ordered by the court (*id.*, § 1033.5, subd. (b)(1)), Regency argues that the offer to compromise statute, by referring to the "costs of the services of expert witnesses," nonetheless treats these fees as an item of costs governed by the postoffer limitation.

We disagree with Regency, for its argument overlooks the fact that awards of expert witness fees under Code of Civil Procedure section 998, subdivision (c) have *never* been tied to when these fees were incurred relative to a compromise offer. As originally enacted, Code of Civil Procedure section 998, subdivision (c) provided, "If an offer made by a defendant is not accepted and the plaintiff fails to obtain a more favorable judgment, the plaintiff shall not recover his costs and shall pay the defendant's costs from the time of the offer. In addition, in any action or proceeding other than an eminent domain action, the court, in its discretion, may require the plaintiff to

pay the defendant's costs from the date of filing of the complaint and a reasonable sum to cover costs of the services of expert witnesses, who are not regular employees of any party, actually incurred and reasonably necessary in the preparation of the case for trial by the defendant." (Code Civ. Proc., former § 998, subd. (c), as added by Stats. 1971, ch. 1679, § 3, pp. 3605, 3606.) The first sentence directed the payment of defense costs "from the time of the offer," the second gave the court discretion to award both "costs from the date of filing of the complaint" and "costs of the services of expert witnesses . . . actually incurred and reasonably necessary in the preparation of the case for trial by the defendant." Thus, only the first, directive provision was limited to postoffer costs.

The Legislature amended Code of Civil Procedure section 998, subdivision (c) in 1997 (Stats. 1997, ch. 892, § 1), deleting its language allowing the discretionary award of costs "from the date of filing of the complaint." Significantly, the 1997 amendments to section 998, subdivision (c) preserved within the new subdivision (c)(1) the prerogative of the court to award "a reasonable sum to cover costs of the services of expert witnesses . . . actually incurred and reasonably necessary in preparation for trial or arbitration of the case by the defendant." (Stats. 1997, ch. 892, § 1.)[12] Had the Legislature intended with this amendment to limit defendants to postoffer expert witness fees, we think it would have said so more clearly, rather than retain language that defined the scope of allowable expert fees by their connection to trial.[13]

We therefore reject all three of Regency's challenges to the award of costs and fees.

---

[12] The 1997 amendment thus made minor modifications to the language within Code of Civil Procedure section 998, subdivision (c) relating to the award of expert witness fees, which from 1977 to that time had authorized the award of fees "actually incurred and reasonably necessary in either, or both, the preparation *or* trial of the case by the defendant." (See Stats. 1977, ch. 458, § 1, p. 1513, italics added.) In 1999, the Legislature amended section 998, subdivision (c)(1) to reinstate the court's authority to award expert witness fees incurred *at* trial or arbitration, which inadvertently had been repealed in 1997. (Stats. 1999, ch. 353, § 1; Assem. Com. on Judiciary, Analysis of Sen. Bill No. 1161 (1999–2000 Reg. Sess.) July 13, 1999, pp. 1–2.)

[13] Also, the Legislature's avowed purpose in amending the statute in 1997 was to "remove an inequality in the current law which treats defendants more favorably than plaintiffs." (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 73 (1997–1998 Reg. Sess.) July 16, 1997, p. 6.) At that time and up until a 2005 amendment to the statute, plaintiffs could receive expert witness fees under Code of Civil Procedure section 998, subdivision (d), regardless of when these fees were incurred relative to the compromise offer. (See Stats. 2005, ch. 706, § 13 [adding the word "postoffer" to section 998, subdivision (d)].) We hesitate to read the 1997 amendments as putting defendants in a *worse* position than that occupied by plaintiffs at that time with regard to the recovery of expert witness fees, as Regency would have us do.

### III. Disposition

We affirm the judgment of the Court of Appeal.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied October 11, 2006, and the opinion was modified to read as printed above.