Filed 6/9/15  Downey Real Estate Holding v. Los Angeles County MTA CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DOWNEY REAL ESTATE HOLDING, LLC | B244647 (consolidated with B247931) |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC465234) |
| v. | |
| LOS ANGELES COUNTY METROPOLITAN TRANSPORTATION AUTHORITY, | |
| Defendant and Appellant. | |

APPEALS from orders of the Superior Court of Los Angeles County, Michael P. Linfield, Judge.  Affirmed in part and reversed in part.

Nick A. Alden and Aleksey Sirotin for Plaintiff and Appellant.

Lewis Brisbois Bisgaard & Smith, LLP, Roy G. Weatherup, Wesley G. Beverlin, Raymond R. Barrera and Allison A. Arabian for Defendant and Appellant.

_____

In this consolidated appeal, plaintiff and appellant Downey Real Estate Holding, LLC (Downey) appeals an order dismissing its inverse condemnation action against defendant and respondent Los Angeles County Metropolitan Transportation Authority (MTA) pursuant to Code of Civil Procedure section 1260.040. [1] [2]

The MTA, in turn, appeals from postjudgment orders denying its motion for cost-of-proof attorney fees and expenses (§ 2033.420) and granting Downey's motion to strike the MTA's memorandum of costs.

On Downey's appeal, we affirm the order of dismissal, concluding the trial court properly determined Downey could not prevail at trial on its claims against the MTA for inverse condemnation and nuisance.

On the MTA's appeal, we affirm the order denying the MTA's motion for cost-of-proof sanctions and reverse the order striking the MTA's memorandum of costs.

## FACTUAL AND PROCEDURAL BACKGROUND

The subject real property is located at 5161 East Pomona Boulevard (on the north side of the street), near the intersection of Atlantic and Pomona Boulevards in East Los Angeles. The site is improved with an L-shaped shopping center and parking lot. Access to the property is via two driveways fronting Pomona Boulevard.

In 2009, the MTA built the Atlantic Boulevard Metro Gold Line light rail station (the Station) in the middle of Pomona Boulevard, directly in front of the entrances to and

---

[1] An inverse condemnation action is an eminent domain proceeding initiated by the property owner rather than the condemner. (*People ex rel. Dept. Pub. Wks. v. Romano* (1971) 18 Cal.App.3d 63, 71 (*Romano*).)

[2] Code of Civil Procedure section 1260.040 states in relevant part at subdivision (a): "If there is a dispute between plaintiff and defendant over an evidentiary or other legal issue affecting the determination of compensation, either party may move the court for a ruling on the issue. The motion shall be made not later than 60 days before commencement of trial on the issue of compensation. The motion shall be heard by the judge assigned for trial of the case."

All further statutory references are to the Code of Civil Procedure, unless otherwise specified.

2

exits from Downey's property. The Station is a 270-foot long raised platform allowing for a maximum of two train cars and a walkway for arriving and departing passengers. The following year, the MTA opened a three-story parking structure for 250 vehicles, directly to the east of the subject real property.

1. *Pleadings.*

On July 12, 2011, Downey filed suit against the MTA alleging causes of action for inverse condemnation and nuisance.[3] The gravamen of the action is that the placement of the Station in the middle of Pomona Boulevard, which had the effect of turning Downey's portion of Pomona Boulevard into a one-way westbound street, substantially impaired access to the shopping center, causing loss of tenants and a diminution in value. Downey also alleged the Station, parked trains, and parking structure obstructed the visibility of the shopping center, and that the Station and parking structure constituted a nuisance.

2. *The MTA's dismissal motion.*

One year later, on July 9, 2012, two months before the trial date, the MTA filed a motion for dismissal pursuant to section 1260.040.

The MTA contended Downey lacked a legally compensable claim because a property owner cannot state a claim based on alteration of traffic flows in abutting streets resulting from the construction of public improvements. It also argued the obstructed view claim was not compensable under California law. Finally, because the construction of the Station and related parking structure were expressly authorized by statute, those improvements could not be deemed a nuisance.

---

[3] The original complaint incorrectly designated David Raminfard as the plaintiff, but the complaint later was amended to substitute Downey in his stead.

3. *Downey's opposition*.

In opposing the dismissal motion, Downey contended that section 1260.040 unconstitutionally deprives a property owner of the right to a jury trial or bench trial, and that the statute was not intended to be used to adjudicate liability or to dispose of an entire case.

With respect to the merits, Downey asserted it stated a claim for substantial impairment of its right of access to and from the property as a consequence of the placement of the Station and parking structure. Downey argued "the correct approach to determine if a compensable impairment of ingress and egress has occurred is by looking at the access available to the particular property before and after the impairment and then deciding on a case by case basis if the impairment is substantial." Here, Downey lost unrestricted access to Pomona Boulevard in both directions. The presence of the Station in the middle of the street precludes eastbound drivers from making a left turn to enter the shopping center; the presence of the Station also precludes exiting drivers from turning left onto Pomona Boulevard. As a result, ingress and egress have become more circuitous and are now substantially impaired.

Downey also contended its claim for loss of visibility was viable because the same thing that impaired ingress and egress, i.e., the Station, was causing the loss of visibility.

As for the nuisance claim, Downey argued it was viable because the presence of parked trains at the Station for extended periods of time is not expressly authorized by statute.

4. *Trial court's ruling.*

On August 9, 2012, after hearing the matter, the trial court granted the MTA's dismissal motion, setting forth its rationale in an extensive minute order.

Relying on *Dina v. People ex rel. Dept. of Transportation* (2007) 151 Cal.App.4th 1029 (*Dina*), the trial court rejected Downey's argument that section 1260.040 is unconstitutional.

4

With respect to the inverse condemnation claim, the trial court ruled the cases "make clear that plaintiff's allegations that the train station and Gold Line have made it difficult to enter the property because Pomona Blvd. is now a one way street and that patrons cannot make a left directly into the shopping center are insufficient to support a finding plaintiff suffered a substantial impairment of access. A reduction in access is simply not considered a taking. '[S]treet alterations which cause significantly increased traffic or which reduce but do not eliminate access to a property do not give rise to a compensable taking.' [Citation.] . . . [The] cases make clear, the conversion of a street from a two-way street to a one-way street does not affect the basic right of direct access to plaintiff's property.

Further, "[w]ithout a compensable claim for lack of ingress or egress, Plaintiff [cannot] state a claim for diminution of visibility. See *Regency Outdoor Advertising, Inc. v. City of Los Angeles* (2006) 39 Cal.4th 507, 521-523 [(*Regency*)].)"

The nuisance claim likewise was meritless because "the conduct at issue here was clearly 'authorized pursuant to statute,' and there is no indication that [the MTA's] actions involve unnecessary activity, are illegitimate, or were committed with the purpose of harassing plaintiff."

On August 21, 2012, the trial court entered an order of dismissal, and on October 17, 2012, Downey filed a timely notice of appeal from the order of dismissal.

5. *Subsequent proceedings.*

    a. *Costs.*

On December 4, 2012, the MTA filed a memorandum of costs, seeking $13,512.81.

On December 17, 2012, Downey filed an objection and motion to strike the cost memorandum as untimely on the ground it was filed more than 60 days after the August 21, 2012 order of dismissal.

On February 26, 2013, the trial court granted Downey's request to strike, on the ground that the order of dismissal was entered on August 21, 2012, and the California

5

Rules of Court (hereafter, rules) require a memorandum of costs to be served and filed within 15 days after the date of mailing of notice of entry of judgment or dismissal. (Rule 3.1700(a)(1).)

b. *Cost-of-proof sanctions*.

On December 4, 2012, the MTA also filed a motion for cost-of-proof attorney fees and expenses pursuant to section 2033.420, seeking $85,528 as reimbursement for attorney fees and expenses it "incurred to prove matters wrongfully denied in [Downey's] responses" to the MTA's requests for admission (RFAs).

On January 31, 2013, after hearing the matter, the trial court denied the MTA's request, stating "I just don't think that the [section] 2033.420 purposes would be served. I don't think, in this case, given the facts of this case, that justice would be served by granting the motion for the attorneys' fees and expenses that are requested by defendant."

c. *The MTA's appeal*.

On April 2, 2013, the MTA filed a timely notice of appeal from the postjudgment orders striking its cost memorandum and denying its motion for cost-of-proof sanctions.

On August 5, 2013, Downey's appeal and the MTA's appeal were consolidated, with the latter appeal being deemed a cross-appeal.

## CONTENTIONS

Downey contends: (1) the trial court erred in utilizing section 1260.040 as the basis for a dispositive motion on the issue of liability for inverse condemnation and nuisance; (2) the trial court abused its discretion in denying Downey's request for a continuance to present additional evidence of impaired access; (3) the trial court erred in dismissing the action because Downey established a substantial impairment of access to its property, obstructed visibility of its property, and the existence of a nuisance due to the constantly parked trains at the Station.

The MTA contends: it is entitled to recover cost-of-proof attorney fees because Downey denied important objective facts within its knowledge, without substantial

6

justification; and it is entitled to recover its costs because it was the prevailing party and its memorandum of costs and disbursements was timely filed.

## DISCUSSION

### I. DOWNEY'S APPEAL.

1. *Section 1260.040 may be employed to bring a dispositive motion in an eminent domain or inverse condemnation case.*

Downey contends the trial court erred in relying on section 1260.040 to dispose of the case because the statute was never intended to provide for disposition of an entire case by motion.

*Dina*, *supra,* 151 Cal.App.4th 1029, cited by the trial court, is dispositive. *Dina* rejected the contention "that section 1260.040 does not authorize the trial court to resolve the entire action." (*Id*. at p. 1039.) In fact, based on the legislative history of section 1260.040, *Dina* observed the legislation was intended " 'to facilitate resolution of eminent domain cases without the need for trial.' " (*Id*. at p. 1042.) *Dina* concluded, "Nothing in the language of section 1260.040 or its legislative history bars a party from seeking an order on a legal issue that disposes of an inverse condemnation action." (*Id*. at p. 1044.) *Dina* further held that section 1260.040 does not violate the right to a jury trial because, in inverse condemnation actions, " 'the right to jury trial . . . is limited to the question of damages.' " (*Id*. at pp. 1044, quoting *San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 951.)

Finally, *Dina* rejected the argument that pretrial resolution of the issue of liability is limited to motions for summary judgment. "The procedural mechanism implemented by section 1260.040 expressly 'supplements, and does not replace any other pretrial or trial procedure otherwise available to resolve an evidentiary or other legal issue affecting the determination of compensation.' (§ 1260.040, subd. (c).) Moreover, a motion for summary judgment is not the exclusive means by which a trial court can consider evidence in resolving issues before trial. (See Cal. Rules of Court, rule 3.1112(b) ['Other

7

papers may be filed in support of a motion, including declarations, exhibits, appendices, and other documents or pleadings'].)" (*Dina*, *supra,* 151 Cal.App.4th at p. 1046.)

We find *Dina's* reasoning and its discussion of the legislative history of section 1260.040 to be persuasive. Although Downey "respectfully disagrees" with *Dina*'s holding that section 1260.040 is constitutional, that is not a basis for reversal.

2. *No abuse of discretion in denial of continuance.*

Downey next contends that even assuming section 1260.040 may be used for a dispositive motion on the issue of liability for inverse condemnation, the trial court abused its discretion in refusing Downey's request to continue the hearing on the section 1260.040 motion. However, we perceive no abuse.

The record reflects that on August 9, 2012, the matter came on for hearing. Counsel for both parties indicated they had read the tentative ruling and they proceeded with their arguments. Just before the hearing ended, Downey's counsel orally requested a continuance of 30 to 45 days, to "give us the time to go and find those people [truck drivers], depose them, and prove to the court that the services that this shopping center could get before the station are not available today."

The trial court denied the request to continue the matter, stating: "Had you come in previously with a motion to continue, the court certainly would have considered it. And would be inclined to do so, to continue. After we've had briefing on both sides, a five-page tentative, argument for about 25 minutes, and then to ask for a continuance I think is just not . . . . [¶] . . . [¶] . . . The court is going to adopt its tentative as its order."

Our review of the trial court's decision denying a continuance is deferential. The decision to grant or deny a continuance is committed to the sound discretion of the trial court, and a reviewing court may not disturb the exercise of discretion by a trial court in the absence of a clear abuse thereof appearing in the record. (*Thurman v. Bayshore Transit Management, Inc*. (2012) 203 Cal.App.4th 1112, 1126.)

The record amply supports the trial court's refusal to continue the matter. As indicated, Downey did not seek a continuance of the MTA's dismissal motion until just

8

before the end of the hearing, after the parties had seen the tentative ruling and had presented oral argument.

The trial court also was mindful that additional testimony would not have affected the outcome: "So had you had 10 more declarations of people saying, 'you know, I normally turn left and I decided to go to the business down the street because it was just too much of a pain to go three blocks to make a U-turn and come back, that would be fine evidence; but I don't think that makes any difference legally." As we discuss, *post*, the trial court properly concluded the additional witness declarations would have been unavailing to Downey because the question presented was one of law -- was the placement of the Station in the middle of Pomona Boulevard, effectively transforming Downey's portion of Pomona Boulevard into a one-way street, legally compensable?

Moreover, the hearing on the section 1260.040 motion was held on August 9, 2012, more than a year after the action was filed, and just one month before the scheduled trial date (Sept. 10, 2012). Impaired ingress and egress was the basic theory of Downey's lawsuit, so Downey could not have been surprised by the issues raised in the MTA's dismissal motion. With the trial date rapidly approaching, Downey should have completed all the truck drivers' depositions that it deemed to be necessary. Therefore, the trial court was well within its discretion in refusing Downey's belated request for a 30 to 45 day continuance, which would have delayed the section 1260.040 hearing to a date *beyond* the date set for trial.

3. *Trial court properly dismissed Downey's inverse condemnation claim alleging a substantial impairment of access to its property from the roadway and loss of visibility.*

In essence, Downey's theory is that the MTA's construction of the Station in the middle of Pomona Boulevard, in front of Downey's shopping center property, and the MTA's construction of an adjacent parking structure, substantially impaired both the access to and view of Downey's property and caused a substantial diminution in value, so as to entitle Downey to compensation for inverse condemnation.

a. *Inverse condemnation.*

An inverse condemnation cause of action derives from article I, section 19 of the California Constitution, which states in relevant part: "(a) Private property may be taken or damaged for a public use and only when just compensation . . . has first been paid to, or into court for, the owner." Property "is 'taken or damaged' within the meaning of article I, section 19 of the California Constitution, so as to give rise to a claim for inverse condemnation, when: (1) the property has been physically invaded in a tangible manner; (2) no physical invasion has occurred, but the property has been physically damaged; or (3) an intangible intrusion onto the property has occurred which has caused no damage to the property but places a burden on the property that is direct, substantial, and peculiar to the property itself. [Citations.]" (*Oliver v. AT&T Wireless Services* (1999) 76 Cal.App.4th 521, 530, italics omitted.)

The property owner has the burden of establishing that the public entity has, in fact, taken or damaged his or her property. (*San Diego Gas & Electric Co. v. Superior Court*, *supra*, 13 Cal.4th at p. 940.)

b. *Property owner's right of access to public streets.*

Merely because ingress and egress have become less convenient does not give rise to a right to compensation. "As long as there is access to the abutting road and from there to the next intersecting street in at least one direction, there is no legally cognizable impairment of access." (*Border Business Park, Inc. v. City of San Diego* (2006) 142 Cal.App.4th 1538, 1557, citing *People v. Ayon* (1960) 54 Cal.2d 217, 223-224 (*Ayon*).)

As the Supreme Court stated in *Ayon*, *supra*, 54 Cal.2d 217, "the right of a property owner to ingress and egress is not absolute. He cannot demand that the adjacent street be left in its original condition for all time to insure his ability to continue to enter and leave his property in the same manner as that to which he has become accustomed. Modern transportation requirements necessitate continual improvement of streets and relocation of traffic. The property owner has no constitutional right to compensation

10

simply because the streets upon which his property abuts are improved so as to affect the traffic flow on such streets. If loss of business or of value of the property results, that is noncompensable. It is simply a risk the property owner assumes when he lives in modern society under modern traffic conditions. [¶] *The compensable right of an abutting property owner is to direct access to the adjacent street and to the through traffic which passes along that street.* [Citation.] If this basic right is not adversely affected, a public agency may enact and enforce reasonable and proper traffic regulations without the payment of compensation *although such regulations may impede the convenience with which ingress and egress may thereafter be accomplished, and may necessitate circuity of travel to reach a given destination.* 'In the proper exercise of its police power in the regulation of traffic, a state or county may do many things which are not compensable to an abutting property owner, *such as constructing a traffic island, placing permanent dividing strips which deprive an abutter of direct access to the opposite side of the highway, painting double white lines on the highway, or designating the entire street as a one-way street.* [Citations.]' (*People v. Russell* [(1957)] 48 Cal.2d 189, 197 [(*Russell*)].) The *Russell* case held that the use of a parkway as a traffic separation strip between a state highway and a county road was a noncompensable traffic regulation." (*Ayon, supra*, 54 Cal.2d at pp. 223-224, italics added.)

*Ayon* concluded, "Under these well-settled rules the appellants are not entitled to compensation because of the divider strip placed in the middle of Azusa [Avenue]. They have direct access to that street and to traffic traveling in one direction on that street. [Citations.] Nor can appellants complain because the relocation plan will divert some southbound traffic from Azusa in front of appellants' property. A property owner has no right to compensation because traffic is rerouted or diverted to another thoroughfare even though the value of his property is substantially diminished as a result. [Citations.]" (*Ayon*, *supra*, 54 Cal.2d at p. 224.)

Thus, the landowner's right is to "an easement of access which permits travel onto the street upon which his land abuts, and from there, in a reasonable manner, to the

11

general system of public streets. [Citations.] Such an easement constitutes a property right [citations], the substantial impairment of which is cognizable in an eminent domain proceeding. [Citation.] [¶] *The determination whether the interference with access constitutes a substantial impairment is a question of law; if compensable impairment is found, then the extent of such impairment is a matter of fact for determination by the jury.* (*Breidert v. Southern Pac. Co.* [(1964)] 61 Cal.2d 659, 664.) In making the determination whether there is a substantial impairment of defendant's access to the general system of public streets and public highways, our inquiry is tantamount to determining whether [the owner's] right of access has been unreasonably interfered with. [Citations.]" (*Romano*, *supra*, 18 Cal.App.3d at pp. 72-73, italics added.)

*Romano* applied the test of substantial impairment to its fact situation and found no such impairment. (*Romano*, *supra*, 18 Cal.App.3d at p. 73.) *Romano* observed, inter alia, "assuming that new Meridian Road is relevant to the context of impairment of access to the general system of public streets, the record discloses that [condemnee] is caused, at most, to travel a distance of 2,400 feet from her home to the nearest available entry into new Meridian Road." (*Ibid.*; accord *People ex rel. Dept. of Public Works v. Wasserman* (1966) 240 Cal.App.2d 716, 730 [alternate route which was one-third of a mile longer after the construction of the improvement did not constitute a substantial impairment of the defendants' access to general system of public streets].)

*Romano* observed, "[t]he real basis of [condemnee's] claim appears to be that she had a legal right to old Meridian Road in its before condition. This contention is without merit. The legal right which reposed in [condemnee] was a right of access to the general system of public streets and not the right to have one particular street remain in its original condition. . . . [Condemnee's] compensable right was to an easement which permitted her to get into the street upon which her property abutted and from there, in a reasonable manner, to the general system of public streets. [Citation.] Her access to the street on which her property abutted was unimpaired. From that street, . . . she could

12

proceed to the general system of public streets in a reasonable manner." (*Romano*, *supra*, 18 Cal.App.3d at pp. 73-74.)

   c. *Direct access to Pomona Boulevard and to the general system of public streets has not been substantially impaired.*

Downey's claim of impaired access to its premises is predicated on the following facts:

The subject property is improved with a one story commercial building and a two story commercial building, which function as a shopping center consisting of 12 stores, including restaurants, insurance offices, video, water, and tobacco supplies stores. The subject property has a parking lot that is used for customer parking and deliveries. There is no vehicular access to the property from the north, east or west. To the south is Pomona Boulevard, an east/west street, which is the only means of ingress and egress.

In 2009, the MTA built the Station in the middle of Pomona Boulevard, directly in front of the entrances to and exits from Downey's property. The Station is a 270-foot long raised platform allowing for a maximum of two train cars and a walkway for arriving and departing passengers.

In 2010, the MTA completed a three-story park-and-ride structure for the Station. The parking structure is located directly to the east of the subject property and is separated by a wall, so that there is no vehicular access to Downey's property from the east.

Admittedly, notwithstanding the placement of the Station in the middle of Pomona Boulevard, customers driving westbound on Pomona Boulevard still have regular access to enter the subject property. However, due to the presence of the Station, customers driving east on Pomona Boulevard are no longer able to turn left to enter the subject property. In order to reach the property, eastbound drivers are required to make a U-turn at Pomona and Atlantic Boulevards, or if that proves too difficult, to continue another half mile east on Pomona Boulevard, make a U-turn there, and then drive a half mile west, back to the subject property.

13

Customers are still able to exit the shopping center by going west on Pomona Boulevard, but due to the presence of the Station, departing customers can no longer go directly east onto Pomona Boulevard from the subject property. In order to go eastbound, customers are required to go westbound on Pomona for 0.3 miles until La Verne Avenue, in order to make a U-turn to go east on Pomona.

Further, certain larger vehicles are no longer able to enter the subject property because the Station impedes their access. This has had an impact on tenants' ability to receive delivery of supplies and inventory, and this has also meant that the drivers of those vehicles no longer patronize the stores at the shopping center because their trucks cannot enter the property.[4]

Viewing these facts in light of the case law set forth *ante*, we conclude the trial court properly found Downey was incapable of prevailing at trial on its claim of substantial impairment of its right of access to the subject property. The placement of the Station in the middle of Pomona Boulevard has the same effect as if the municipality had exercised its police power and turned Pomona Boulevard into a one-way street. Downey's customers continue to enter and exit the shopping center parking lot via the original two driveways that existed before the Station was built. Contrary to Downey's argument, there has not been a "major grade change" in the street.[5] Vehicles enter and

---

[4] For example, one of the retail tenants filed a declaration in support of Downey's opposition to the motion, stating: "Prior to the train station, Fire Department trucks would frequently come to eat at my restaurant. After the construction of the Train Station, the Fire Department trucks stopped eating at my restaurant because it [sic] could no longer enter the shopping center." We note Downey does not contend the inability of large fire trucks to access the property gives rise to a fire hazard; Downey's claim is that firefighters have stopped patronizing the businesses at the shopping center.

[5] A "major change in the grade of the road, such as construction of highway underpasses, overpasses and freeway off-ramps, which prevents direct access to a property abutting the new construction, is a substantial impairment of access. (See, e.g., *Blumenstein v. City of Long Beach* (1956) 143 Cal.App.2d 264, 267-269 [freeway off-ramp]; *Anderson v. State of California* (1943) 61 Cal.App.2d 140, 143 [grade of road fronting plaintiff's property elevated several feet to build bridge]; *Goycoolea v. City of*

exit the shopping center parking lot at the same grade as previously. Further, vehicles still have access to Pomona Boulevard, to Atlantic Boulevard and to the general system of public streets.

We recognize that drivers traveling eastbound on Pomona Boulevard, who seek to enter the shopping center parking lot, must either make a U-turn at Pomona and Atlantic Boulevards or drive another half mile up Pomona Boulevard and make a U-turn there and then head west, to reach the subject property. Further, drivers exiting the parking lot, who need to travel east, must first drive 0.3 miles west on Pomona Boulevard to make a U-turn at La Verne Avenue in order to travel east.

Although access to the property is somewhat more circuitous, under the controlling case law this circumstance is insufficient to give rise to a claim for inverse condemnation. (*Ayon*, *supra*, 54 Cal.2d at pp. 223-224; *Russell, supra,* 48 Cal.2d at p. 197.)

In an attempt to distinguish *Ayon*, Downey focuses on language therein that *temporary* interference with a property owner's rights during construction of public improvements is generally noncompensable (*Ayon, supra,* 54 Cal.2d at p. 228), and argues that *Ayon* is inapposite because Downey has suffered substantial *permanent* impairment of ingress and egress as a result of the Station and parking structure. Downey's reading of *Ayon*, as being limited to the issue of temporary interference during construction of public improvements, is overly narrow. To reiterate, *Ayon* states there is

*Los Angeles* [(1962)] 207 Cal.App.2d 729, 733-735 [street abutting plaintiff's property substantially narrowed to create a raised viaduct on remaining portion of road which blocked air, light and view to property]." (*Brumer v. Los Angeles County Metropolitan Transportation Authority* (1995) 36 Cal.App.4th 1738, 1746; accord *United Cal. Bank v. People ex rel. Dept. Pub. Wks.* (1969) 1 Cal.App.3d 1, 8 [street in front of store was "lowered in level and separated by a guardrail from the sidewalk making it unusable as a place for store customers to board and alight from their vehicles"]; *Bacich v. Board of Control* (1943) 23 Cal.2d 343, 351 [plaintiff alleged that "by reason of the lowering of Harrison Street fifty feet below the level of Sterling Street the access that plaintiff formerly had to Harrison Street from Sterling Street has now been lost except for an almost perpendicular flight of stairs"].)

no right to compensation, inter alia, when a public entity places " '*permanent dividing strips* which deprive an abutter of direct access to the opposite side of the highway.' " (*Id.* at p. 224, italics added.)  In effect that is what occurred here.  Due to the placement of the Station in the middle of Pomona Boulevard, Downey has lost direct access to the opposite side of the street.  This street alteration is not compensable.

d. *Downey has no compensable claim for impaired visibility*.

As the trial court ruled, to be compensable, a claim of reduced visibility must be tethered to a compensable claim of impaired physical access; a reduction of visibility, standing alone, is not compensable.  (*Regency*, *supra*, 39 Cal.4th at p. 520, fn. 7.)

Downey contends that because it stated a compensable claim for impaired ingress and egress, it also established a compensable claim for diminished visibility.  Our determination that Downey's claim of impaired access is not compensable also disposes of Downey's claim for compensation based on obstructed visibility.

4. *No viable claim for nuisance based on trains parked at the Station.*

Civil Code section 3482 provides:  "Nothing which is done or maintained under the express authority of a statute can be deemed a nuisance."

Here, the construction, operation, and maintenance of the Station is expressly authorized by Public Utilities Code section 30631, which provides in relevant part:  "The district[6] may acquire, construct, develop, lease, jointly develop, own, operate, maintain, control, use, jointly use, or dispose of rights-of-way, rail lines, monorails, buslines, stations, platforms, switches, yards, terminals, parking lots, air rights, land rights, development rights, entrances and exits, and any and all other facilities for, incidental to, necessary for, or convenient for rapid transit service, including, but not limited to,

---

**6**  The "district" denotes the Southern California Rapid Transit District (RTD). (Pub. Util. Code, § 30004.)  However, in 1992, the Legislature merged the RTD with the Los Angeles County Transportation Commission to form the MTA, which succeeded to all of the powers, duties, rights and obligations of the RTD.  (Pub. Util. Code, §§ 130050.2, 130051.13; *Silver v. Los Angeles County Metropolitan Transportation Authority* (2000) 79 Cal.App.4th 338, 342.)

16

facilities and structures physically or functionally related to rapid transit service, within or partly without the district, underground, upon, or above the ground and under, upon, or over public street, highways, bridges, or other public ways or waterways, together with all physical structures necessary for, incidental to, or convenient for the access of persons and vehicles thereto . . . ." (*Id.*, at subd. (a).)

Although "acts authorized by statute cannot give rise to nuisance liability, " 'the *manner* in which those acts are performed may constitute a nuisance.' " (*Jones v. Union Pacific Railroad Co.* (2000) 79 Cal.App.4th 1053, 1067 (*Jones*).) In *Jones*, railroad employees allegedly were "needlessly blowing train horns and whistles and idling train engines in front of property owners' homes for hours on end, at all hours of the day and night, for no legitimate purpose." (*Id.* at pp. 1067-1067, italics omitted.) This conduct constituted "*allegedly unnecessary activity, serving no legitimate purpose, and/or activity allegedly committed for the sole purpose of harassing plaintiffs.*" (*Id.* at p. 1068, italics added.) *Jones* held the trial court erred in granting summary judgment based on Civil Code section 3482 because the activity in question was not expressly authorized by statute. (*Id.* at p. 1068.)

In the instant case, Downey's theory of nuisance is based on the MTA's "parking of train cars in front of [Downey's] property for extended periods of time." Downey concedes the MTA's intent in doing so is *not* for the sole purpose of harassing Downey. However, Downey asserts the MTA failed to identify "any legitimate purpose for constantly parking the trains at the station." The argument fails.

The record reflects that the subject Station is at the eastern terminus of this rail line. Given the Station's location at the end of the line, it reasonably can be expected that train cars will be parked at this location. As stated in *Friends of H Street v. City of Sacramento* (1993) 20 Cal.App.4th 152, 163, "Although the relevant statutes do not expressly authorize the City to operate its streets in a manner which generates traffic, noise, fumes, litter, and headlight glare, . . . such loss of peace and quiet is a fact of urban life which must be endured by all who live in the vicinity of freeways, highways, and city

17

streets." In the instant case, urban life adjacent to the terminus of a rail line inevitably brings with it the sight of parked railcars.

We conclude Downey failed to show the parking of trains at the Station was unnecessary and served no legitimate purpose. Therefore, the trial court properly dismissed the nuisance claim, in addition to the inverse condemnation claim.

5. *Evidentiary issues*.

Downey contends the trial court improperly excluded certain evidence that prejudiced Downey in its efforts to show substantial impaired access. For example, Raminfard, Downey's principal, stated that he received multiple complaints from tenants regarding lack of customers, lack of visibility, inability to put a sign on the property, problems getting supplies to the shopping center, train cars parked in front of the shopping center, and tenants' inability to pay rent as a result of reduced business. Two tenants submitted declarations to similar effect. The trial court sustained the MTA's objection to these statements as inadmissible hearsay.

Downey contends the various hearsay objections should have been overruled because the statements were not offered for the truth of the matter asserted, but rather, to prove the impact on the tenants, as well as the effect that the tenants' complaints had on Raminfard's state of mind and his behavior in reducing his tenants' rent. The argument is unavailing.

The trial court correctly concluded these out-of-court statements were hearsay. Moreover, as the trial court observed at the hearing on the section 1260.040 motion, even if such additional evidence had been admitted, it would not have changed the outcome. The pivotal issue was whether there was a legally compensable impairment of access. The trial court stated, "I'll indicate if you had 10 declarations from people stating it's harder to get into the place now – I have no doubt that that is true. I mean, it's clear to the court that it's impacted your client. People can't turn left, if they're going in one direction. The problem . . . for your client is that the court doesn't think that this is

18

compensable. It's not that you haven't suffered any harm or [that] there hasn't been a loss in business, it simply is not compensable."

As the trial court found, the proffered evidence had no bearing on the ultimate legal issues herein. Therefore, the claim of prejudicial evidentiary error must fail.

## II. THE MTA'S APPEAL.

### 1. *No abuse of discretion in denial of MTA's request for cost-of-proof sanctions.*

On September 20, 2011, two months into the litigation, the MTA propounded a set of 19 RFAs to Downey. The RFAs were broad in scope. For example, RFA No. 1 asked Downey to admit that the MTA did not inversely condemn Downey's real property, and RFA No. 4 asked Downey to admit that the MTA's construction of the Station did not constitute a public or private nuisance damaging Downey's property. Downey's responses denied nearly all of the RFAs, including RFAs No. 1 and No. 4.

Following the MTA's successful motion to dismiss Downey's case pursuant to section 1260.040, the MTA filed a motion for cost-of-proof attorney fees and expenses pursuant to section 2033.420, seeking $85,528 as reimbursement for attorney fees and expenses it "incurred to prove matters wrongfully denied in [Downey's] responses" to the RFAs.

On January 31, 2013, after hearing the matter, the trial court denied the MTA's request, stating "I just don't think that the [section] 2033.420 purposes would be served. I don't think, in this case, given the facts of this case, that justice would be served by granting the motion for the attorneys' fees and expenses that are requested by defendant."

#### a. *General principles*.

Section 2033.420 provides in pertinent part at subdivision (a): "If a party fails to admit the . . . truth of any matter when requested to do so under this chapter, and if the party requesting that admission thereafter proves the . . . truth of that matter, the party requesting the admission may move the court for an order requiring the party to whom the request was directed to pay the reasonable expenses incurred in making that proof, including reasonable attorney's fees."

19

The trial court "shall make this order unless it finds any of the following: [¶] (1) An objection to the request was sustained or a response to it was waived under Section 2033.290. [¶] (2) The admission sought was of no substantial importance. [¶] (3) The party failing to make the admission had reasonable ground to believe that that party would prevail on the matter. [¶] (4) There was other good reason for the failure to admit." (§ 2033.420, subd. (b).)

The determination of whether there were no good reasons for the denial, whether the RFA was of substantial importance, and the amount of expenses to be awarded, if any, are all within the sound discretion of the trial court. (*Bloxham v. Saldinger* (2014) 228 Cal.App.4th 729, 753.) " 'An abuse of discretion occurs only where it is shown that the trial court exceeded the bounds of reason.[7] [Citation.] It is a deferential standard of review that requires us to uphold the trial court's determination, even if we disagree with it, so long as it is reasonable. [Citation.]' " (*Ibid.*)

b. *No abuse of discretion in trial court's ruling*.

Section 2033.420 "authorizes only those expenses 'incurred in making that proof,' i.e., proving the matters denied by the opposing party." (*Garcia v. Hyster Co.* (1994) 28 Cal.App.4th 724, 736-737; see generally, Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2014) § 8:1405.1 et seq. [costs recoverable are limited to reasonable expenses incurred after denial and are limited to expenses incurred in *proving* matters denied].)

Here, however, as Downey argued below, the MTA did not pinpoint the expenses it incurred in proving the 14 RFAs which were the focus of its motion for cost-of-proof

---

[7]    For example, in *Wimberly v. Derby Cycle Corp.* (1997) 56 Cal.App.4th 618, a products liability action involving a defective bicycle, the trial court abused its discretion in denying the plaintiff's request for cost-of-proof sanctions because "the defect and causation issues were of 'substantial importance' [and the facts established] the only inference that [could] reasonably be drawn [was] that when [defendant] Derby denied Wimberly's requests for admissions, it had no reasonable belief it could prevail on the causation and defect issues." (*Id*. at p. 638.)

20

sanctions. Instead, the MTA sought to recover nearly the entirety of the attorney fees and expenses it incurred in this litigation subsequent to Downey's denial of the RFAs. The generalized nature of the MTA's request supports the trial court's refusal to award cost-of-proof sanctions. Further, the MTA's motion did not specify what facts it proved that made Downey's denial of the RFAs improper.

In addition, the essential issue herein, i.e., whether the transformation of Pomona Boulevard into a one-way street is legally compensable, is controlled by settled case law, discussed *ante*. The August 9, 2012 order granting the MTA's dismissal motion reflects that the MTA did not prevail as a consequence of having proven facts that Downey denied in its responses to the 14 RFAs now at issue. Rather, the trial court's decision in favor of the MTA was largely based on its determination that the case law applicable to the facts alleged by Downey does not recognize a compensable taking. The trial court ruled, "[the] cases make clear that *plaintiff's allegations* that the train station and Gold Line have made it difficult to enter the property because Pomona Blvd. is now a one way street and that patrons cannot make a left directly into the shopping center *are insufficient* to support a finding plaintiff suffered a substantial impairment of access." (Italics added.) Further, "[w]ithout a compensable claim for lack of ingress or egress, *Plaintiff cannot state a claim* for diminution of visibility. See *Regency*[, *supra*,] 39 Cal.4th [at pp.] 521-523." (Italics added.) Thus, the MTA prevailed because of the controlling case law, not because it proved the matters in the 14 RFAs that Downey had denied. Accordingly, the trial court reasonably could conclude that the RFAs were "of no substantial importance" to the resolution of this case. (§ 2033.420, subd. (b)(2).)

For all these reasons, the trial court acted within the bounds of its discretion in declining to award the MTA cost-of-proof sanctions.

*2. Trial court erred in striking MTA's memorandum of costs as untimely.*

On August 21, 2012, the trial court signed and filed an order dismissing Downey's case.[8]

On December 4, 2012, the MTA filed a memorandum of costs, seeking $13,512.81.

On December 17, 2012, Downey filed an objection and motion to strike the cost memorandum as untimely because it was filed more than 60 days after the August 21, 2012 order of dismissal.

On February 26, 2013, the trial court granted Downey's request to strike, on the ground that the order of dismissal was entered on August 21, 2012, and rule 3.1700(a)(1) requires a memorandum of costs to be served and filed within 15 days after the date of mailing of the notice of entry of judgment or dismissal.

The trial court correctly stated the law but misapplied the rule in this fact situation.

Rule 3.1700(a)(1) provides in relevant part: "A prevailing party who claims costs must serve and file a memorandum of costs within 15 days after the date of mailing of the *notice of entry of judgment or dismissal by the clerk* under Code of Civil Procedure section 664.5 or the date of service of *written notice of entry of judgment or dismissal*, or within 180 days after entry of judgment, whichever is first." (Italics added.)

Here, there is no indication that either the clerk or a party served written notice of entry of the August 21, 2012 order of dismissal. Accordingly, the December 4, 2012

---

[8] Section 581d provides: "A written dismissal of an action shall be entered in the clerk's register and is effective for all purposes when so entered. [¶] All dismissals ordered by the court shall be in the form of a written order signed by the court and filed in the action *and those orders when so filed shall constitute judgments and be effective for all purposes*, and the clerk shall note those judgments in the register of actions in the case." (Italics added.) Thus, the August 21, 2012 order of dismissal constituted a judgment and was immediately appealable. On October 17, 2012, Downey filed a timely notice of appeal, specifying the August 21, 2012 order of dismissal. The MTA's assertion that Downey's notice of appeal was premature is meritless.

memorandum of costs, which was served and filed within 180 days after the entry of the order of dismissal, should not have been stricken as untimely.

Lastly, Downey argues that one of the items in the MTA's memorandum of costs was subject to being stricken for an additional reason: the memorandum of costs included a request for an award of expert witness fees in the amount of $8,881.51 per section 998.[9] In this case, the MTA extended a $15,000 section 998 offer on March 5, 2012. According to Downey, this offer was unreasonable and was not made in good faith, and therefore, the $8,881.51 in expert fees should have been stricken from the MTA's memorandum of costs.

Downey's challenge to the expert fees in the memorandum of costs is not properly before this court. Contesting costs is by way of a motion to strike or tax costs, filed within 15 days after service of the cost memorandum (rule 3.1700(b)(1)), which occurred here on December 4, 2012. The record reflects that in the court below, in Downey's "Objection To And Request to Strike" the MTA's memorandum of costs (filed by Downey on December 17, 2012), Downey solely argued the memorandum of costs was filed *late*. Downey did not move to strike the expert fees from the memorandum of costs on the ground the MTA's section 998 offer was unreasonable and lacking in good faith. Therefore, in ruling on the motion to strike, the trial court was not asked to consider

---

**9**    Section 998 states in relevant part at subdivision (c)(1): "If an offer made by a defendant is not accepted and the plaintiff fails to obtain a more favorable judgment or award, the plaintiff shall not recover his or her postoffer costs and shall pay the defendant's costs from the time of the offer. In addition, in any action or proceeding *other than an eminent domain action*, the court or arbitrator, in its discretion, may require the plaintiff to pay a reasonable sum *to cover costs of the services of expert witnesses*, . . . ." (Italics added.) An inverse condemnation action is not an eminent domain action within the meaning of section 998. (*Goebel v. City of Santa Barbara* (2001) 92 Cal.App.4th 549, 558-560.) Therefore, an unsuccessful inverse condemnation plaintiff may be held liable for expert fees under section 998. (*Id*. at p. 560.)

23

whether the MTA made a good faith section 998 offer, and the issue is not properly before this court.[10]

We conclude the memorandum of costs should not have been stricken as untimely. Therefore, the trial court should have awarded the MTA the entire $13,512.81 in costs that it requested (including the $8,881.51 in expert fees).

---

[10] The record reflects that instead of attacking the expert fees in its motion to strike the memorandum of costs, Downey raised its objection to the claimed expert fees in its opposition to the MTA's motion for cost-of-proof attorney fees and expenses, which Downey filed one month later. In its opposition to the MTA's request for cost-of-proof sanctions, Downey included the contention that "The Request for Expert's Fees Should Be Stricken Because Defendant's Section 998 Offer Was Not Made In Good Faith." However, Downey's objection to the expert fees in the costs memorandum should have been asserted in its motion to strike costs (rule 3.1700(b)), not in its opposition to the MTA's motion for cost-of-proof sanctions.

**DISPOSITION**

The order of dismissal/judgment, and the postjudgment order denying the MTA's motion for cost-of-proof sanctions, are affirmed. The postjudgment order striking the MTA's memorandum of costs as untimely is reversed with directions to enter a new order awarding the MTA its costs in the sum of $13,512.81. The parties shall bear their respective costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

KITCHING, J.

ALDRICH, J.

25